[Civ. Nos. 2785, 2805.   Fourth Dist.   July 19, 1941.]

ALBERT BECK et al., Appellants, v. EVA C. CAGLE et al., Respondents.   (Two Cases.)

Alfred Siemon, Bennett Siemon, David E. Peckinpah and L. N. Barber for Appellants.

Hanna & Morton and Ray W. Hays for Respondents.

MUNDO, J., *pro tem.*—This is an action to require respondent Eva C. Cagle to account for money, property and things of value received by her by reason of dealings and transactions in regard to a government oil and gas prospecting permit. The superior court (Judge Klette sitting) sustained the demurrer of the defendant Superior Oil Company without leave to amend, and a judgment of dismissal was entered thereon. An appeal was duly taken, but prosecution of that appeal was suspended by consent of the parties pending the outcome of the case against the other defendant. The case then went to trial (Judge Austin sitting) and judgment was rendered in favor of defendant Eva C. Cagle. An appeal was likewise taken from this judgment. Both appeals are now before this court together. Since the case will appear to be such that Superior Oil Company would be liable only in the case of liability on the part of defendant Eva C. Cagle, it is well to proceed to the determination of the liability, if any, of Eva C. Cagle in the premises.

Eva C. Cagle was the owner of a federal oil and gas prospecting permit, which is practically equivalent to the ordinary oil and gas lease granted to a private landowner, covering 528 acres in the Coalinga area in Fresno County. In March, 1932, she and Albert Beck started negotiating with the view of Mr. Beck acquiring an interest in the property. Their negotiations led to the execution of the following instrument:

"Security Title Insurance and Guarantee Company
"Riverside, California.

"Riverside, California
"April 21, 1932.

"Gentlemen:

"I hand you herewith the sum of $200.00, and will on or before 30 days hand you the additional sum of $1300.00, all of which you are hereby authorized and instructed to deliver to Eva C. Cagle, or her order, when you hold for me an operating agreement covering the right to explore, drill for, produce and market oil, gas and kindred substances on the following land:

"W ½ of W ½; NE ¼ of NW ¼; N ½ of NE ¼ of Section 6, township 20 South Range 16. E., M.D.B. & M.; consisting of 328 acres.

"And to be on the form now deposited in escrow or form known as lease form 88, to be at the option of Albert Beck, and when satisfactory title evidence has been submitted to the escrow and approved by Albert Beck as to the condition of the title to the oil rights.

"I will also deposit a personal unsecured note in the amount of 2,000.00 due on or before July 1, 1932, interest at 7% from the close of escrow payable at maturity and same is to be signed by the Artesia Investment Company; and the lease first above referred to is to be made to the Artesia Investment Company, and note to be made to Eva C. Cagle and delivered when lease above referred to is ready.

"I am to pay the escrow fee and the cost of bringing the title down from the present report.

"ARTESIA INVESTMENT Co., a corp.
"By ALBERT BECK, Secy.

"The foregoing instructions are hereby approved and I am to pay the cost of bringing the title down to the present report already made to San Bernardino Office. The broker in this deal is D. A. Bean and his commission is to be settled outside of escrow.

"EVA C. CAGLE.

"Apr. 21, 1932

"I have received the $200.00 to have been deposited, outside of escrow ($200.00).

"EVA C. CAGLE.

"May 19, 1932.

"I hereby extend the time for depositing balance, an additional 10 days.

"EVA C. CAGLE.

"Aug. 12, 1932.

"In place of money called for in these instructions, I am to deliver an Essex sedan, satisfactory to Mrs. Cagle, and will or B4 3 weeks deposit 1485.00 cash to be delivered to her.

"ALBERT BECK.

"Approved:

"EVA C. CAGLE."

Following the execution of this instrument, the parties continued their negotiations over a period of several months by means of letters, telegrams and conversations. During the period of these negotiations, Mr. Beck advanced money to respondent Cagle to be credited to the escrow in amounts from 10¢ to $200, and gave her a Buick automobile for which he had paid $375. The total cash so advanced was approximately $675.

About May 12, 1933, respondent Cagle subleased the property to Lon V. Smith, which sublease was later assigned to the Superior Oil Company. No development work was done on the property during the period of negotiations between Mr. Beck and Mrs. Cagle. The Superior Oil Company obtained production on the property in 1939, whereupon plaintiff filed this action against Eva C. Cagle and the Superior Oil Company.

Plaintiffs have pursued two inconsistent theories for recovery, set up in two counts of the complaint: first, that the so called escrow agreement was a meeting of the minds of the parties upon everything necessary to constitute a valid contract, including the drilling by Mr. Beck on the 328 acres and that he could elect to treat the sub-lease with Superior Oil Company as a completion of a joint adventure creating a trust in one-half of the profits in his favor. The second theory was that the law implied a joint adventure because respondent failed to return the moneys advanced by plaintiff upon the termination of the negotiations for the operating agreement giving the plaintiff the right to an accounting for such share of the profits as may be determined by the court to be just.

Respondent Cagle relied upon the defenses that the parties failed definitely to agree upon anything and therefore no contract ever existed; that the so called escrow agreement failed

to meet the requirements of the statute of frauds and that in any event appellants' action was barred by the statute of limitations and by laches.

According to the escrow agreement the operative rights which Mr. Beck was to have were to be on a certain form, a form supposed to have been deposited in escrow or form known as lease form number 88. No form was actually deposited in escrow, form number 88 or otherwise, but Mr. Beck, after requesting the respondent Cagle to fill out a form in October, 1932, filled in the blanks of a form and sent it to respondent Cagle. The latter replied with the following letter:

"San Bernardino, Calif.
"October 7, 1932

"Mr. Albert Beck,
"391 Palm Street,
"Anaheim, California.
"Dear Mr. Beck:

"After a thorough study of the 88 Form you left in my possession, it seems totally incompetent to cover a government permit. In fact, this form is more in the nature of an option than it is of a drilling agreement, and as you know I am in no position to grant an option for any period at all, let alone one for the term of two years. I have typed a copy of the agreement drawn by Mr. Hintze leaving out the features you found objectionable, and I know that your attorney will give you his opinion and on this I must rest. I am also enclosing a form relative to the 200 acres. I must ask that you make some immediate effort to begin operations on the land, also close the escrow in its entirety, because it is necessary for me to know what to base my application for extension that I intend to make the first of the week. I have tried to be patient, knowing that you have many matters demanding your attention, yet it is now time for me to give heed to my interests. Should you find it convenient, I would like to have your answer at once. Should you find it impractical to complete the deal, will you please send me the maps and other data you have in your possession relative to my permit? Mr. Jergens of Long Beach has some small interest in the Edison area and has expressed a wish to look over the maps and data on both my permits. I went through Riverside on my way to Long Beach today, and it seems that your little playmate, Dan Bean, was still among the missing. What a sour dish he

has turned out to be. I certainly would like to have you go through with the program as you outlined it yesterday, Mr. Beck, but I cannot afford to wait any longer. If it is necessary for me to apply for an extension on my own efforts, without being able to state that a drilling arrangement has been made with you, I feel that I should withdraw all ties at the Security escrow, which will leave us both free and no obligation on either side. Please let me hear from you as to your wishes in the matter. Also please convey my sincere regards to your wife.

"Sincerely yours,
"Eva C. Cagle."

Thereafter, respondent Cagle demanded that appellant Beck complete the escrow by putting in the balance of the money. Mr. Beck told her that he would not give her the balance of the money until she put the lease in or gave him the lease as per the terms of the escrow. Mrs. Cagle told Mr. Beck that she was going to cancel the escrow if he did not put in the money. On January 16, 1933, she wrote on the escrow instrument: "You are hereby notified that the within escrow agreement is hereby cancelled and of no further force or effect. Eva C. Cagle." This attempted cancellation subsequently was withdrawn.

On January 23, 1933, Mr. Beck wrote to Mrs. Cagle as follows:

."Anaheim, California
"January 23, 1933

"Eva C. Cagle,
"215 G Street,
"San Bernardino, California
"Dear Madam:

"According your telephone call to me Thursday evening collect to me at Anaheim, Calif. I was to meet you in the Alexander Hotel. I got there 1:10 P. M. I was unable to find you but I suppose you were unable to come in on account of the rain. On my return home I found a letter from Attorney A. P. Ohanneson, 518 Washington Building. I will be glad to show you the letter when I see you. In regard to payments I have made you through escrow and moneys I have paid you outside of escrow, my check and cash, and tire bill and grease, car received from Sudduth & Lynd of Long Beach, December 16, 1932. And the Buick car which you

ordered assigned to your mother, Mrs. Mary J. Cook, which is all to apply on the 320 acre Coalinga oil lease and the one-half interest in the 200 acres Coalinga oil lease. We can have our attorneys make both leases in one or make same in two separate leases, to myself, as I will assign same to Albert Beck trust, which I have formed while I was in Oklahoma City, to hand oil properties belonging to myself and wife. I gave you the 88 form of lease, which you told me was satisfactory to you at first, and after I drew same up you wanted changes made, so we will have to get our attorneys together and get a proper oil lease drawn. As our escrow in the title Co. which is contract because money has changed hands, as per your letter to me. But no leases has ever been drawn which has been satisfactory to both of us. I would like to get this shaped up in proper shape, and want to start a well on the Coalinga lease as soon as I finish the Beldridge well which we are now drilling.

"Very truly yours,
"ALBERT BECK."

The parties were out of touch with each other until about February, 1935, at which time respondent Cagle wrote to Mr. Beck. He replied as follows:

"Anaheim, California
"3–18–1935

"Mrs. Eva C. Cagle
"Taft, Cal.
"Dear Mrs. Cagle:

"Received your letter dated February 27th and note what you have to say in regard to some land leases which are open to a permit entry near the Devils Den. You stated you would locate me real cheap on a government permit near there. I will try and arrange to see same the first time I am up that way. You state you would locate me real reasonable on account that I was unable to drill the Coalinga permit. I am sorry to say I would not drill on the Coalinga permit or any other lease or permit until I had proper title, as I have never received a lease from you as per our escrow instructions at the Security Title of Riverside, and same called for an 88 Form lease, and escrow was signed by yourself and myself. And I have all my canceled checks which I paid you outside of escrow, and you had me transfer the Buick car to your mother. This escrow will have to be completed or will have to ask the courts to pass on same and give me title as per

escrow contract. Let me hear from you by return mail. If you are able to furnish the lease as per escrow and I will pay you the balance due you as per escrow as soon as you deliver good title to the oil and gas lease. Please answer soon.

"Yours truly,

"ALBERT BECK."

It would seem from the foregoing that Mr. Beck expected to get a lease from Eva C. Cagle, and that they never reached an agreement on the terms of said lease may be seen from the testimony given by Mr. Beck.

"Mr. Morton: Mr. Beck, you say she did not put anything into escrow in the way of documents. Did you ever put any documents in escrow? You understand. Just answer the question. A. No, I did not. Q. The only document in the way of a lease that you ever prepared and submitted to her was this draft of Form 88 on October 6th? A. I think you are right. Q. The previous Form 88, which you had shown to Mrs. Cagle, at the time of the escrow, was simply a form without anything filled in? A. That is right. Q. Didn't have the date, names, description or anything else? A. That is right. Q. And it wasn't until October 6th of 1932 that you ever, yourself, prepared any formal, written lease? A. That is right. Q. And she told you ten or fifteen times prior to the cancellation of the escrow, that is, prior to the time she wrote that cancellation, she would not take Form 88, didn't she? A. Yes, that is right . . . Q. And when you submitted Form 88, she submitted an entirely different form to you, didn't she, after you submitted the one of October 6, 1932? A. Well, Mr. *Ohanesian* and Mr. Whiteley drew some other forms. Q. But you remember she sent you two forms? A. Yes, sir. Q. With that letter of October 7, 1932? A. That is right. Q. Without comparing them, they were entirely different, particularly in that they required you to drill in a short time, didn't they? A. That is right. Q. The draft you made gave you two years in which to drill if you wanted to? A. That is right. . . . Q. But you were willing to consider changes from this form you submitted? A. No, I liked the 88 Form, which was a very fair form. And the escrow did not provide for any time. It provided to take care of the permit . . . Q. You did not like the one she sent you in this letter? A. I did not. I did not agree to start drilling in 30 days, at any time. . . . Q. You didn't want either form

she sent you? A. I wanted it plainer, in case the government raised the royalty, and she would get a certain amount. Q. In January, 1933, you wrote Mrs. Cagle a letter, which is Exhibit 30—here is a copy, and it says, 'But no lease has ever been drawn which has been satisfactory to both of us.' That was the condition on January 23, 1933, wasn't it? A. That is right. . . . Q. You were willing that could be in one lease or two separate leases? A. Yes, sir. Q. When you say there would be two separate leases possible, you were referring to those two separate parts of the 520 acres? A. That is right.''

The failure of the escrow instructions to set forth the terms of the lease and the failure of the parties subsequently to agree upon the terms of a lease militates against appellants' contention that a binding contract existed. If we were called upon to compel Eva C. Cagle to specifically perform her contract or to compel her to execute a lease, we would have to deny the relief on the ground that there were vital features of the proposed lease upon which the minds of the parties had not met or come together. One important feature which the parties could not agree upon was the time of drilling. Mr. Beck thought he should have two years within which to drill; Mrs. Cagle thought thirty days should be the limit. Other terms such as royalty and the number of wells were not agreed upon.

Mr. Beck says the reason he did not pay the balance of the money was because Mrs. Cagle did not sign form 88. He admits she refused to sign that form and insisted on a different form. This shows a failure of the parties to agree upon the proposed deal.

The only proposal of Mrs. Cagle to let him have a half interest in the 200 acres was contingent upon his drilling a well pursuant to the proposed lease of the 328 acres. Mr. Beck did not even pay the money called for as the consideration for that lease. By endorsement of August 12, 1932, he agreed to pay $1,485 cash within three weeks thereafter. He only paid a few hundred dollars after that date. If we assume he was justified in not paying the balance of the money as he agreed because they had failed to agree between themselves as to the form of the lease, that leads us to the same result, namely, that the parties never reached an agreement.

Appellants urge that the evidence shows that the parties entered into a joint adventure agreement as to the

200 acres. The escrow agreement related only to 328 acres. When Mr. Beck sent Mrs. Cagle form number 88 filled in with the terms and conditions he desired and she rejected those terms and conditions, she sent back a letter and two proposed agreements. One agreement related to the 328 acres and the other to the 200 acres, the latter being contingent upon the fulfillment of the other agreement. Mr. Beck did not accept these proposed agreements. The evidence clearly shows that Mrs. Cagle's offer with respect to the 200 acres was contingent upon the completion of a satisfactory lease on the 328 acres and the drilling of a well thereon by Mr. Beck. That Mr. Beck expected to get two leases is shown by his letter of January 23, 1933, wherein he said that the Buick car was ''to apply on the *320* acre Coalinga oil lease and the one-half interest in the 200 acres Coalinga oil lease. We can have our attorneys make both leases in one or make same in two separate leases.'' The relationship which would have been established had this suggestion been followed by Mrs. Cagle would be that of lessor and lessee rather than of joint adventurers. In other words, negotiations were had with respect to a lease on the 328 acres, the terms of said lease never being reduced to writing by anything signed by the parties or in fact agreed upon in oral agreement. With respect to the other 200 acres Mrs. Cagle, the holder of the property, proposed an agreement which would have been a partnership or joint adventure as to the 200 acres if signed, contingent upon appellant Beck entering into the lease with respect to the drilling of the other 328 acres within 30 days. This does not privilege Mr. Beck to say, because the terms of the lease were not agreed upon and he did not obtain a lease, that he may elect to consider that all the property was being handled on a joint adventure and, perforce he is entitled to now say he can receive one-half of whatever Mrs. Cagle may have received out of the 328 acres or the 200 acres or any of them.

To constitute a joint adventure, there must at least be (a) a community of interest in the object of the undertaking; (b) an equal right to direct and govern the conduct of each other with respect thereto; (c) share in the losses if any; (d) close and even fiduciary relationship between the parties. (*Larson* v. *Lewis-Simas-Jones Co.*, 29 Cal. App. (2d) 83 [84 Pac. (2d) 296].) The only partnership or joint adventure ever proposed was the one in October, 1932, which

162

agreement was never signed and which was contingent upon appellant Beck drilling the 328 acres. The parties here did nothing more than to discuss undertaking some kind of enterprise, drilling, leasing, or selling the 200 acres in the event a deal between them was consummated as to the 328 acres. The evidence does not indicate that any enterprise was ever undertaken wherein the parties had an equal right to direct and govern each other with respect thereto. The question of losses was never mentioned and the parties obviously were not in a close or fiduciary relationship.

Even if we were to assume that a binding contract existed between Mr. Beck and Mrs. Cagle and that there was a joint adventure, we would have to rule that Mr. Beck is too late with his action. The present suit was commenced February 7, 1939, more than four years after Mrs. Cagle indicated by words and deeds that she no longer was dealing with Mr. Beck with respect to the 528 acres. The abandonment or dissolution of a partnership or joint adventure may take place by conduct inconsistent with its continuance. (*Middleton* v. *Newport,* 6 Cal. (2d) 57 [56 Pac. (2d) 508].) Mrs. Cagle testified and the court found it to be true that she called on Mr. Beck about May 11, 1933, and told him that she had a chance to make a deal with others and would do so unless he went through with his proposal and put up all the money; that on that occasion Mr. Beck said that if she made a deal she would have to count him in on it but that she had told him he would not be in on it. Late in 1933, or early in 1934, Mr. Beck consulted an attorney for the purpose of bringing suit against Mrs. Cagle "to enforce the escrow" as he says, but because of business in Oklahoma he put the matter off. Later on, he did not deem it urgent to communicate with Mrs. Cagle. In this connection, he said: "It was a wildcat lease."

"A person may not withhold his claim, awaiting the outcome of an enterprise, and then, after a decided turn has taken place in his favor, assert his interest, especially where he has thus avoided the risks of the enterprise. Accordingly, if the property involved is of a speculative or fluctuating character, more than ordinary promptness is required of a claimant; he must press his claim at the earliest possible time. This rule is applied with great strictness in the case of mining property, since it is of a specially precarious nature, and is exposed to the utmost fluctuations in value." (21 C. J., p.

225, sec. 220. See also, *Warfield* v. *Anglo & London Paris Nat. Bank,* 202 Cal. 345 [260 Pac. 881].)

Since the action against the Superior Oil Company must fail in the absence of a recovery against Mrs. Cagle, it is unnecessary, under the views herein expressed, to further consider the appeal from the judgment of dismissal entered in favor of that respondent.

Both judgments are affirmed.

Barnard, P. J., and Marks, J., concurred.