[Civ. No. 20945.   Second Dist., Div. One.   Jan. 24, 1956.]

ARTHUR ARSENIAN, as Administrator, etc., Respondent,
v. SAROP MEKETARIAN et al., Appellants.

W. Earl Shafer, Shafer & Grimm and Louis J. Euler for Appellants.

Trope & Trope, Sorrell Trope and Eugene L. Trope for Respondent.

FOURT, J.—Plaintiff brought this action as the administrator of the estate of Varsenig Hagopian, also known as Virginia Hagopian, deceased, against the defendants, to reform a deed and to impress a trust upon an undivided one-half interest in a parcel of real property located in Los Angeles County, and for an accounting. Defendants filed a cross-complaint to quiet title to the real property in question in themselves upon the ground that they were the surviving joint tenants.

From the record and the briefs, the facts appear as follows: Mike Hagopian and Virginia Hagopian were born and married in Armenia and migrated to the United States. She could not read nor write, except to sign her signature, and she could speak but a few words in English. He could read a small amount of Armenian and a small amount of English, but the latter was with little understanding. He could not write in English, except to sign his signature. They spoke in Armenian at their home and he spoke Armenian in his business dealings.

The defendants, Yermo and Sarop Meketarian, migrated to the United States from Armenia. Yermo could neither read, write nor speak in English. Sarop used an interpreter at the time of the trial. The Hagopians were in no way related to the Meketarians. They had each known the other for many years before December 8, 1943.

For some time before the date last mentioned, the four of them talked about and considered the purchase of some income property. Mr. Hagopian located the parcel in question, consisting of about eight court units. The four of them agreed to buy the property. Upon deciding to buy the property, they went to the escrow department of the California Bank in their neighborhood, where a Mrs. Ann Callahan was the clerk. There was no one in the bank who could speak Armenian and all communications upon the part of the escrow clerk were in English. No outside advice or assistance was sought by any of the four purchasing parties with regard to the form of the deed or its effect, legal or otherwise.

The deed conveyed the property to the four grantees "all as Joint Tenants." The parties endorsed on the deed as follows: "The undersigned herein accepts the interests herein conveyed to them as joint tenants." Each marital couple paid one-half of the purchase price, the total payment being $12,000.

Mr. Hagopian died on September 2, 1950, about seven years

after the purchase of the property. During his lifetime the rentals were equally distributed between the marital couples. Mr. Hagopian's widow, Varsenig Hagopian, survived him. She died about December 26, 1951. During the 15 months following the death of Mr. Hagopian, substantially 50 per cent of the moneys from the property were paid to Varsenig Hagopian, and the other 50 per cent was paid to the Meketarians.

At the time of the purchase of the property the defendants had four children, aged 16, 17, 18 and 19, respectively, living at their home. They also had one adult married daughter. The assets of the Meketarians consisted of one lot with two frame houses on it, and about $7,000 or $8,000 in cash, from which they paid out $6,000 on the property in question.

After the death of Varsenig Hagopian, Sarop Meketarian stated that he and his wife were partners with Mike and Varsenig Hagopian in the ownership of the property, one-half belonging to Mike and Varsenig Hagopian, and one-half to himself and his wife. He further stated, after Mrs. Hagopian's death, that the property would be sold and the share belonging to the Hagopians would be sent to Mr. Hagopian's brother's children. He also stated to the administrator of the Varsenig Hagopian estate that he should have prepared whatever documents would be needed for presentation to the probate court in the estate of Varsenig Hagopian, and that he would sign any such needed documents. Further, following the death of Varsenig Hagopian, the defendant Sarop Meketarian told the administrator of the estate of Varsenig Hagopian that certain repairs were needed on the property in question and sought the administrator's permission and consent to make the necessary repairs and pay the expenses therefor.

The court found, in substance, among other things, that it was not the intention of the four persons to take or hold the property as joint tenants with respect to each other, but that it was their intention that Mike Hagopian and Varsenig Hagopian would be the owners of an undivided one-half of such property, holding as joint tenants with respect to each other only, and that the defendants, Sarop and Yermo Meketarian, would be the owners of the other undivided one-half interest in the property, holding as joint tenants with respect to each other only. Judgment was entered in conformity with the findings. It was also ordered that the income from the property be divided. The defendants have appealed from the judgment.

The defendants' first contention is that the trial court

should have granted their motion for a nonsuit at the conclusion of the plaintiff's case. They set forth that the deed was unambiguous on its face, and that there was no evidence upon which the court could find that it was not the intention of the four original purchasers to take and to hold the property as joint tenants, all with respect to each other.

The presumption is that a deed is what it purports to be and one who seeks to overcome such presumption has the burden of producing clear and convincing proof. (*Townsend* v. *Wingler*, 114 Cal.App.2d 64, 66 [249 P.2d 613]; *Spataro* v. *Domenico*, 96 Cal.App.2d 411, 413 [216 P.2d 32]; *Beeler* v. *American Trust Co.*, 24 Cal.2d 1, 7 [147 P.2d 583].)

Also, it is true that, "The fact that a deed 'was taken in joint tenancy established a prima facie case that the property was in fact held in joint tenancy.'" (*King* v. *King*, 107 Cal.App.2d 257, 259 [236 P.2d 912].)

However, it is also true that the intention of the parties is controlling, and this intention is manifested by the facts and circumstances of the transaction under which the deed was executed, taken in connection with the conduct of the parties after its execution. (*Spataro* v. *Domenico, supra*, 96 Cal.App.2d 411, 412-413.)

The trial court heard and observed the witnesses testify. He came to the conclusions as heretofore indicated. The rule is that the proof of mistake should be clear, convincing and satisfactory to the court—and that means the trial court —but a mere conflict of the testimony as to a mistake does not require the denial of relief, and the decision of the trial court upon such conflict of evidence is conclusive upon the appellate court. (*Vecki* v. *Sorensen*, 127 Cal.App.2d 407, 414 [273 P.2d 908]; *Home & Farm Co.* v. *Freitas*, 153 Cal. 680, 684 [96 P. 308]; *Hutchinson* v. *Ainsworth*, 73 Cal. 452, 457 [15 P. 82, 2 Am.St.Rep. 823]; *Wilson* v. *Moriarty*, 88 Cal. 207, 211 [26 P. 85].)

Direct evidence is not indispensable, it being sufficient if the circumstances proved are sufficient to convince a reasonable person that there was a mistake in drawing the instrument, and to show clearly of what such mistake consisted, although no witness testifies to personal knowledge of how it occurred. (22 Cal.Jur. 742; *Owsley* v. *Matson*, 156 Cal. 401, 407 [104 P. 983].)

The trial court might well have inferred from the evidence that the parties had no intention of taking and holding the property as joint tenants all with respect to each

other. All four of the purchasers were immigrants from Armenia, none of whom was familiar with the English language. The Hagopians were not related to the Meketarians. At the time of the purchase the defendants had five children, four of whom were minors living at home. From a total of $7,000 or $8,000 cash savings the Meketarians took the sum of $6,000, or about 80 per cent of their cash assets, to pay for their share in the property. Their only other remaining asset was two frame houses and a lot. Surely, the question would arise in the mind of any reasonable person—did the Meketarians intend to enter into a joint tenancy transaction with the Hagopians under those circumstances, circumstances under which they might, for all intents and purposes, disinherit their minor children of 80 per cent of their cash assets if the Meketarians should die first?

The taking into consideration of the conduct of the parties after the transaction was very important in the case at hand. Varsenig Hagopian, after Mike Hagopian's death, received substantially 50 per cent of the proceeds of the property and not 33⅓ per cent thereof. There was also the statement of Mr. Meketarian after Varsenig Hagopian's death, that the property would be sold and the Hagopians' share sent to the nephews of Mr. Hagopian; and the statement by Mr. Meketarian that the Meketarians would sign such deeds or documents as would be needed to transfer the Hagopian share to the Varsenig Hagopian estate. Further, Mr. Meketarian stated that he and his wife and Mr. and Mrs. Hagopian were partners in the property in question. There was also the request by Mr. Meketarian for consent to repair the property after Varsenig Hagopian's death. Furthermore, there was the statement by Mr. Meketarian to the effect that there was little trust between himself and wife and the Hagopians. It was apparent to the trial judge, as it is apparent to this court, that the Hagopians and the Meketarians did not believe nor intend that the property be owned and held by them as joint tenants. Their acts and conduct in every respect belie any such belief or intention.

The next contention of the appellants is that the trial court erred in failing to make findings on all material issues. A reading of the findings here brings us to the conclusion that they are proper and sufficient under the circumstances. It is not necessary to make specific findings as to each of several material issues where the findings taken as a whole, or construed together, clearly show that they include the

court's conclusions upon the material issues. (*Petersen* v. *Murphy*, 59 Cal.App.2d 528, 533 [139 P.2d 49].)

█ Special facts need not be detailed in the findings if a general finding necessarily embodies an implied finding of such special facts. █ Further, failure to find on an issue is not ground for a reversal unless it appears that there was evidence introduced as to such issue sufficient to sustain a finding in favor of the appellant; but where a finding, if made, would necessarily have been against the appellant, he cannot complain of a lack of such finding. (*Petersen* v. *Murphy, supra,* 59 Cal.App.2d 528, 534-535.)

█ " 'It is an established rule that all the findings should be read together and so construed as to uphold rather than defeat the judgment, and to that end the findings are to be liberally construed and any inconsistency therein is to be resolved, if reasonably possible, in favor of sustaining the judgment.' (*Davis* v. *Stulman,* 72 Cal.App.2d 255, 262 [164 P.2d 787].) Reading the findings in the light of these principles it cannot be said that there is a serious or substantial inconsistency or contradiction therein." (*Townsend* v. *Wingler, supra,* 114 Cal.App.2d 64, 69.)

The judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied February 17, 1956, and appellants' petition for a hearing by the Supreme Court was denied March 21, 1956.