[Civ. No. 21400. Second Dist., Div. Three. July 17, 1956.]

R. A. GOLDBERG, Respondent, v. PARAMOUNT OIL COMPANY (a Corporation), Appellant.

Lloyd J. Seay and Macbeth & Ford for Appellant.

Conrad & Conrad and Vivienne Conrad for Respondent.

VALLÉE, J.—Appeal by defendant from an adverse judgment in an action for money allegedly paid for securities sold in violation of the Corporate Securities Act.

Defendant had a contract with the owner of realty in Kern County giving it the right to develop underlying oil deposits, under which the landowner's royalty was one-eighth of all oil recovered. On February 2, 1953, defendant entered into a written contract with plaintiff which reads:

*"SUB Operating, Maintenance and Drilling Agreement.*

"WITNESSETH:

"1. Paramount has an Operating and Maintance Agreement, covering in part certain real property in Kern County, State of California, described as [description].

"2. R. A. Goldberg is willing to pay Paramount Oil Co, the sum of $3.00 per foot for drilling wells, in the above named property, such wells are to be drilled not less than 200 feet deep, nor deeper than 499 per well, the location of said wells to be at a place designated by Paramount Oil Co.

"Two wells should be drilled simultanously [sic], and payments are due, when a log for the completed well has been furnished to Goldberg.

"In no case shall Paramount drill more than Six wells, and the total footage of all six wells , shall not exceed 1666 feet.

"3. If oil is discovered in commercial quantities, which means more than ½ barrel per day, the well will be put on production, to recover any and all oil, and Paramount agrees to Pump, maintain and *and* all equipment, pump oil in tank,

heat same and sell same at Standard prices for such oil in that territory, and for doing all such work, plus furnishing all labor, material and equipment, Paramount is to retain 75% of all Moneys, received by Paramount for the Oil, and Goldberg will receive 25% of any and all such moneys received by Paramount. Paramount certified, that the royalty payment under Paramounts Agreement to the landowner is only ⅛ of all oil recovered, so that Paramounts Oil share of the total will be ⅞ of all oil produced. Payment of oil royalties are to be made by Paramount, to Goldberg within Five days after receipt of such payments by Paramount.

"4. As of this date two wells have been drilled on the above property as follows:

"Well. 'Beer' 1-J . . . . 252′ deep completed. 'Beer' 1-K . . . . 255′ deep completed [.]"

Plaintiff paid defendant $4,171 pursuant to the contract. The action is to recover that sum. The trial court concluded the transaction constituted a sale of securities in violation of the Corporate Securities Act and rendered judgment in favor of plaintiff for the amount sued for with interest. No permit to issue securities was obtained.

Defendant maintains the contract contemplated a joint venture for the development of oil and the transaction was therefore exempt under Corporations Code, section 25100, subdivision (n), which read:

"Except as otherwise expressly provided in this division, the Corporate Securities Law does not apply to any of the following classes of securities: . . .

"(n) Any bona fide joint adventure interest, except such interests when offered to the public." Defendant relies on *People* v. *Syde*, 37 Cal.2d 765 [235 P.2d 601], which says "that the Corporate Securities Law was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture. Such contracts are clearly distinguished from instruments issued to persons who, for a consideration paid, stipulate for a right to share in the profits or proceeds of a business enterprise to be conducted by others; and the court will look through form to substance to discover whether in fact the transaction contemplates the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers are to share."

The term "security" includes "any certificate of interest

or participation; any certificate of interest in a profit-sharing agreement; any certificate of interest in an oil, gas, or mining title or lease; any transferable share, investment contract, or beneficial interest in title to property, profits, or earnings." (Corp. Code, § 25008.) It has been held repeatedly that an instrument which evidences a fractional or percentage interest in oil production is a certificate of interest in an oil title or lease, hence a security within the meaning of the act, and that a permit is required for the transfer of such an interest. (*People* v. *Craven*, 219 Cal. 522, 523 [27 P.2d 906]; *People* v. *Sidwell*, 27 Cal.2d 121, 126 [162 P.2d 913]; *M. G. N. Oil Co.* v. *Guiberson*, 126 Cal.App.2d 87, 88 [271 P.2d 525]; anno: 163 A.L.R. 1070.) The facts in *People* v. *Sidwell, supra,* were substantially the same as in the case at bar. The parties entered into a contract by which the defendants agreed to set aside a percentage interest in an oil well as a consideration for a loan by one Moore, one of the parties, of $5,000 to be used to complete the well, and on its completion to make application for permission to transfer the interest to Moore. The contract provided the defendants would give Moore a note for $5,000. As part of the transaction Moore delivered $5,000 to the defendants and they executed a note to him in that amount. The court held the defendants issued and sold a security within the meaning of the act. A contract similar to the one here was before the court in *McFaul* v. *Deck,* 30 Cal.App.2d 424 [86 P.2d 890]. It was urged that because the contract said it was the intent and purpose of the parties to create a tenancy in common between them, such a tenancy was created. Holding the contract did not create a tenancy in common, the court stated (p. 427):

"Among other things, it is evident from an examination of the foregoing document that the Tujax Oil Company expected and intended to maintain dominion and control over the real property described, for the purpose of developing oil and gas thereon. Under such circumstances the instrument is a security within the meaning of the Corporate Securities Act."

A joint venture "is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." (*Nelson* v. *Abraham,* 29 Cal.2d 745, 749 [177 P.2d 931].) "To constitute a joint adventure, there must at least be (a) a community of interest in the object of the undertaking; (b) an equal right to direct and govern the conduct of each other with respect thereto; (c) share in the

losses if any; (d) close and even fiduciary relationship between the parties." (*Beck* v. *Cagle,* 46 Cal.App.2d 152, 161 [115 P.2d 613].) ■ A joint proprietary interest and right of mutual control over the subject matter of the enterprise or over the property engaged therein are essential to a joint venture. (*Parker* v. *Trefry,* 58 Cal.App.2d 69, 75 [136 P.2d 55].) ■ The question whether a joint venture was created was primarily a question for the trial court to determine from the evidence and the inferences to be drawn therefrom. (*Spier* v. *Lang,* 4 Cal.2d 711, 716 [53 P.2d 138].)

■ Defendant is a corporation. Defendant's president, Hefter, drew the contract. Plaintiff was engaged in the plywood lumber business, not in the oil business. He was not responsible for any of defendant's obligations. He had no knowledge or control as to when or how wells would be drilled or put on production. He had no rights, duties, or obligations other than the payment of the money on receipt of logs for completed wells. Under the contract, and in fact, defendant maintained dominion and control over the oil development and the expenditure of the money paid by plaintiff. Plaintiff had none. The contract specifically says the moneys to be paid plaintiff are "oil royalties." The contract did not create a joint venture.

Defendant says the court erred in excluding evidence relating to the control and activity of plaintiff. We do not find such exclusion. Plaintiff, called by defendant, testified: he did not pay any money to defendant prior to the drilling of any wells because he did not know how much he would owe defendant for each well; defendant drilled a well and then submitted a bill and a log showing the actual footage and he paid on that; he did not, during the drilling, employ an oilman or consult with an oilman regarding the drilling of "these wells"; he did not tell Hefter not to drill any more wells or to drill no deeper; Hefter "knew how much I could spend and that was the end"; he was to spend "not to exceed $3.00 a foot, 1,666 feet altogether," a total of $5,000; sometime later Hefter suggested "we put in $1500.00 more to see if there was any oil down there"; Hefter did not suggest "going to 475 feet, or less than 500 feet"; "Q. And as a matter of fact, you told him [Hefter] at the end of that period, after you spent $4,171.00 that you didn't want him to drill any deeper; isn't that true? A. Well, that was the agreement, I believe, to drill six wells only. That is correct. He had drilled six wells. Q. Now up until that time, as quick

as he drilled one well, he had attempted to put it on production, or were they all drilled before he attempted to put them on production? A. I don't know when he attempted to put them on production. Q. Did you ever visit the lease at any time? A. At one time on my way back from San Francisco when I was up there, I stopped about ten minutes, but I couldn't visit anything. It was really quite deserted out there. I talked to a man who was on a truck. I think he was drilling. I believe he was drilling on the lease, but other than that, I never saw the oilfield.''

Hefter, called by defendant, testified: ''Q. Mr. Hefter, after you had drilled 200 feet on any of these wells, did you and Mr. Goldberg have any conversation? A. Yes, sir. Q. Relative to what? A. To drill deeper, because I didn't think the half valve was large enough to keep the pumps operating. Q. What did you say to Mr. Goldberg with reference to going deeper? A. I told him we would deepen the well to 325 or 375 and we would average eight to ten barrels a day, and that we should go down to that level. Q. What did Mr. Goldberg say about that? A. Well, he came up to the office and he said he didn't want to spend any more money on the venture. That was on September 16, 1953. Q. As the result, did you continue to drill any deeper? A. No.''

Hefter was asked, ''Q. Mr. Hefter, what was said between you and the Plaintiff about how deep these wells were to be drilled and how many wells, and so forth?'' The time referred to was that during which the contract was being drawn. ■ An objection was sustained. The question called for a matter embodied in the contract and was indefinite and uncertain—''and so forth.'' The objection was properly sustained. ■ Hefter was also asked, ''Q. Mr. Hefter, after you had drilled to the depth of 200 feet, who was to determine whether or not you should drill deeper?'' An objection was sustained and properly so. The question obviously called for a conclusion of the witness. Hefter was also asked, ''Q. Now Mr. Hefter, after you had drilled to 200 feet, did you in accordance with your agreement understand that you could drill any deeper without the consent of Mr. Goldberg?'' An objection was sustained. Again the question called for a conclusion of the witness. The contract specifically provided that defendant could drill each well to 499 feet so long as the total footage of the six wells to be drilled did not exceed 1,666 feet. The ruling was correct. These were the only exclusions. The court did not exclude any

evidence offered by defendant relating to claimed control and activity of plaintiff.

It is asserted the evidence does not support the findings because plaintiff was kept informed of progress and was consulted by Hefter. The only evidence plaintiff was consulted by Hefter is that found in the testimony of plaintiff and Hefter to which we have referred. The evidence that plaintiff was kept informed of progress consisted of written statements from defendant to plaintiff for money due under the contract with logs of wells attached; and letters from defendant to plaintiff informing him of production and requesting payment of statements rendered, informing him defendant was forced to shut down pumping operation because of failure of production, requesting plaintiff to agree that defendant could deepen wells below the contract maximum at $3.00 a foot to be paid by plaintiff, and in the event plaintiff did not agree that defendant would abandon the wells, and informing plaintiff the contract was terminated because of his refusal to agree to deepening the wells below the maximum specified in the contract. ■ None of this evidence shows any participation by plaintiff in the conduct of the enterprise. Plaintiff was a mere investor. The contract without ambiguity contemplated he was to play the passive role of investor only. He did not expect to reap a profit from his own services or other active participation in the enterprise within the rule of *People* v. *Syde*, 37 Cal.2d 765 [235 P.2d 601].

■ Defendant claims the court did not find on the issue of a joint venture and that its failure to do so is fatal to the judgment. The complaint alleged in paragraph IX that the contract "was in fact a sale of securities, made by defendants without a permit, in violation of the Corporate Security Act, and therefore void." The court found: "That the allegations contained in Paragraph IX are true, the agreement having been found to be the sale of security made without a permit in violation of the Corporate Securities Act"; and concluded, "That the transaction, the subject matter of the action herein, is a Security as defined by the Corporate Securities Act . . . [t]hat the Security was sold to plaintiff without a permit from the Corporation Commissioner, in violation of the Corporate Securities Act, and therefore, said transaction was void." The court further found that pursuant to the contract plaintiff paid defendant $4,171 and concluded defendant should pay plaintiff that sum with interest.

■ "As to the principles governing appellate courts

in considering the adequacy of findings to dispose of issues and support a judgment it is a general rule that 'Even though a finding might have been more clearly phrased, it is sufficient if its language is clear enough to indicate what the court intended; and if there are findings sufficient to support the judgment, they are not vitiated by the unintelligibility of others. ▮ Any uncertainty in the findings will be construed so as to support the judgment rather than to defeat it.' (24 Cal.Jur. 965, § 201.) . . . ▮ It is also to be noted that while full findings are required upon all material issues a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made. (See 24 Cal.Jur. 974, § 207, and cases cited.) '' (*Richter* v. *Walker*, 36 Cal.2d 634, 639 [226 P.2d 593].) ▮ A reviewing court will not disturb the implied findings made by a trial court in support of a judgment any more than it will interfere with express findings on which a final judgment is predicated. (*Bailey* v. *County of Los Angeles*, 46 Cal.2d 132, 137 [293 P.2d 449].) We do not find in the record, nor is it suggested, that defendant objected to plaintiff's proposed findings on the ground now urged before the findings were signed, nor on a motion for a new trial. In *Tooke* v. *Allen*, 85 Cal.App.2d 230 [192 P.2d 804], this court stated (p. 238) :

''When section 634, Code of Civil Procedure, was amended in 1913 to require the service of findings, and again in 1933 to require that they be not signed prior to five days after service, the purpose was to permit of a procedure for the pointing out of defects in the proposed findings, including objections that they were uncertain or not sufficiently specific. The situation presented to us here is one in which we think the objection should be deemed to have been waived by the failure to urge it in the trial court. (*Del Ruth* v. *Del Ruth*, 75 Cal.App.2d 638, 644-645 [171 P.2d 34].) Since the record is silent on the subject, it will be deemed to have been waived. We must presume the record includes all matters material to a determination of all points on appeal. (Rules on Appeal, rule 52.) '' (See also *Bourke* v. *Frisk*, 92 Cal.App.2d 23, 32 [206 P.2d 407] ; *Perry* v. *Manning*, 109 Cal.App.2d 557, 561 [241 P.2d 43].) The finding made is necessarily one that the contract was not in the nature of a joint venture. It is inconsistent with any theory that the contract created a joint venture.

█ Further, where a finding, if made, would necessarily have been against the appellant, he cannot complain of an absence of such finding. (*Arsenian* v. *Meketarian,* 138 Cal. App.2d 627, 633 [292 P.2d 293].) █ Since there was no evidence that would have supported a finding that the contract created a joint venture, a finding, if made, would necessarily have been against defendant.

The judgment is not vulnerable in respect to any of the points urged.

Affirmed.

Wood (Parker), J., concurred.

SHINN, P. J.—I concur in the judgment and the opinion except for the narrow definition of a joint venture found in some of the cited cases. I do not think the term can be defined with an exactitude that will serve as a guide in every case of joint undertakings for profit. I would prefer a definition that is somewhat elastic, and which gives major consideration to the intentions of the parties, to one which requires conformance to the equivalent of a mathematical formula.