**Ramon VICIOSO and Camilo S. Jorge, Plaintiffs,**

v.

**L. A. WATSON, individually and doing business as Watson Oil Company, Defendants.**

**No. 69–732.**

United States District Court, C. D. California.

March 23, 1971.

Horvitz & Minikes, Los Angeles, Cal., J. D. White, Wichita, Kan., for plaintiff.

Pacht, Ross, Warne, Bernhard, Sears & Nutter, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

DAVID W. WILLIAMS, District Judge.

Evidence in this case was presented before this Court sitting without a jury. Jurisdiction is found in the Securities Act of 1933, 15 U.S.C. § 77v(a).

The plaintiffs are doctors with successful practices in the Los Angeles area. In the fall of 1967 they were looking for tax shelter opportunities in which to invest some of their income. About this time, a Mr. Wofford from Wichita, Kansas came to Los Angeles to sell fractional interests in oil drilling ventures in his home state and plaintiffs attended a meeting held by Wofford at the International Hotel to which he invited a number of potential investors and made a presentation of his proposition. Impressed by Wofford's plan, the doctors requested Emanuel Kaleidas, their accountant, to check on Wofford's credentials. Kaleidas had frequently put together real estate and other investment deals for a group of doctors including plaintiffs in return for a commission and he had some experience in oil and gas leases and oil drilling. The plaintiffs seemed particularly attracted by Wofford's plan to sell shares in four oil leases rather than in a single one and his assurance that he would guarantee at least one successful drilling.

Kaleidas consulted an attorney in Kansas concerning Wofford, but not being able to furnish much information concerning him, the attorney suggested that the accountant call defendant Watson who was in the oil drilling business and had his own company. Watson was unable to be very helpful in giving background on Wofford, but in their discussion Kaleidas informed him of the purpose of his inquiry and of the desire on the part of the doctors to invest and Watson suggested that he might be able to put a similar investment package together and participate in the venture. Immediately thereafter, Watson took options on four leases, obtaining two from Sungold, his wholly owned corporation, and two oral options on leases owned by third parties. At the request of Kaleidas, Watson and his geologist came to Los Angeles two days after their first conversation and met with plaintiffs. This meeting broke up in disorder because plaintiffs wanted Watson to guarantee production from at least one well (as Wofford had allegedly done), but Watson, asserting that no reputable person in the trade would make such guarantee, refused. The next morning the meeting between Watson and the doctors was reconvened and plaintiffs finally indicated their willingness to go forward with the proposition if their attorney approved. The plan was that plaintiffs

would purchase fractional interests in a package of four oil and gas leases with two producing wells, upon Watson's promise to drill additional wells before the end of the year. The parties visited a lawyer's office that same day and after gaining his approval of the plan, Dr. Vicioso gave Watson his check for $12,500.00 as consideration for a 3/16 interest and Dr. Jorge later mailed his check for $25,000.00 in payment of a 6/16 interest. No contracts were signed at this meeting because plaintiffs' lawyer demanded that certain amendments be made to the form proffered by Watson. After returning to his home, Watson made the changes and returned the contracts to Los Angeles for signature.

A contract between Watson and Dr. Vicioso and another between Watson and Dr. Jorge were subsequently executed. According to these contracts, Watson executed his options in the four leases and then sold plaintiffs undivided fractional interests in the leases for a specified amount. Watson was to bear the cost of providing a well on each piece of property, but in the event oil production was undertaken, plaintiffs were to share in proportion to their interests in the cost of setting pipe and removing it if no oil was found. Each person's lease interest was burdened by its proportionate share of the landowner's royalty. Watson agreed to commence drilling a test well on each piece of property before December 31, 1967, so that the plaintiffs could obtain the maximum tax benefits from their investment. Furthermore, Watson stated that he would provide plaintiffs with copies of all geological reports and tests after completion of a well and, upon request, would also furnish plaintiffs with daily drilling reports and inform them of testing operations so that they could be present at the rig.

The contracts having been signed on or about December 15, 1967, Watson began drilling shortly thereafter and all parties apparently abided by the provisions of the agreement until March of 1968 when plaintiffs became unwilling to continue in the transaction and refused to make any further payments for drilling expenses. Watson's testimony was that for some time thereafter he continued to drill, bearing the costs thereof from his own funds until it became too expensive for him to bear alone. He then decided to sell his interest in the leases to one Kathol Company at a sizeable discount. He wrote to plaintiffs to tell them of his intentions and invited them to sell their interests to Kathol at the same price but plaintiffs declined to do so. Plaintiffs then brought suit against Watson demanding rescission of the lease assignment and return of the money they invested upon the ground that the transaction was in violation of the California Corporations law and the Federal Securities law. No permit was obtained by Watson from the California Commissioner of Corporations authorizing the assignment of interest in the oil and gas leases, nor did he file a registration statement with the Securities Exchange Commission.

Section 25500 of the California Corporations Code in effect in 1967 prohibited one from selling "any security of its own issue * * * (without having) first applied for and secured from the commissioner a permit authorizing it so to do." While this statute applied to the great majority of securities transactions, it did not apply to all such transactions. The Code specifically exempted certain classes of securities from the permit requirement, one such exemption extending to "any bona fide joint adventure interest, except such interests when offered to the public." Corporations Code, § 25100(m).

The plaintiffs in this suit correctly point out that the lease interests assigned by Watson to plaintiffs were securities and that Watson was their issuer. The case law uniformly holds that interests in oil and gas leases constitute securities under § 25500 and that the assignor of such interests is the issuer. People v. Craven, 219 Cal. 522, 27 P.2d 906 (1933); Domestic and Foreign Petroleum v. Long, 4 Cal.2d 547, 51 P.2d 73 (1935). The defendant does not con-

test this conclusion. However, he asserts that the specific transaction at issue does not require a permit because it was a joint venture entered into by all three parties and therefore exempt from the permit requirement. I conclude that the defendant is correct.

The concept of joint venture has not been very thoroughly developed by the courts. There has, however, been some minimum agreement as to the nature of this arrangement. A joint venture is consistently defined as "an undertaking by two or more persons jointly to carry out a single business enterprise for profit." Four criteria have frequently been required for a joint venture. There should be (1) a community of interest among the parties, (2) a share in profits and losses, (3) a close and fiduciary relationship between the parties, and (4) a right to control possessed by each party. The four criteria have been less than strictly interpreted. Some cases have stated that share in the losses is unnecessary so long as there is a share in the profits. Some cases have stated that each member of the venture must have an equal right to control, while others require only a right in some measure to control. The variety of arrangements which can constitute a joint venture is suggested in Stilwell v. Trutanich, 178 Cal.App.2d 614, 619, 3 Cal.Rptr. 285, 288 (1960), where the Court stated that, "a community of interest may exist although the property forming the capital of the adventure is not jointly owned by the parties and although one of the parties has contributed money, another property and another skill * * *. [a]lthough it is usual to provide for an equal sharing of profits and losses, the parties may agree to an unequal distribution of the profits, or they may agree that all the parties shall participate in the profits and only certain of them in the losses. * * * [a]lthough it has been said that joint control of the undertaking and equal power to direct the enterprise is an essential element * * * this is not to say that there cannot be a joint venture where the parties have unequal control of operations. * * * " (Citations omitted.)

Applying these criteria to the suit before me, I find that they have been met. The plaintiffs clearly shared an interest with the defendant in the outcome of the undertaking; each desired oil production and the profits therefrom. They all shared in the profits of production in proportion to their interest in the individual leases, and in the cost of drilling and potential losses in the same proportions. The evidence also indicates that there was a close fiduciary relationship among the parties. For example, the doctors were to receive daily drilling reports. Furthermore, even after the doctors breached their obligations under the contracts, before Watson sold his interest in the leases, he informed the plaintiffs of his intentions and advised them to do likewise.

The disagreement among the parties stems chiefly over the fourth criterion, the issue of control. The plaintiffs point out that they lived in California while Watson lived in Kansas where the wells were located. Watson had extensive experience in oil and gas production while the plaintiffs had none. The plaintiffs conclude that they did not in fact exercise any control over the drilling operations, and because of the distance and their lack of expertise, had no realistic expectation of control. While the plaintiffs' conclusion is correct, it is not responsive to the issue of whether or not they had a right to control. The right to control can exist even though there is no exercise of control or any expectation of such exercise. Furthermore, the right to control can be expressly or impliedly delegated to other members of a joint venture.

The cases dealing with this issue indicate that the right to control is to be interpreted quite differently than plaintiffs have suggested. In Stilwell v. Trutanich, *supra*, the plaintiffs were doing business as a seafood company and the defendants were owners of a vessel. The parties entered into an agreement to

go to Mexico on the vessel to purchase, transport and sell seafood products. The plaintiffs were responsible for deciding what and when to purchase and the defendants provided transportation. Their agreement designated the percentage of profits which each party should receive. The Court held their arrangement to be that of a joint venture. In Polizzi v. Porcaro, 110 Cal.App.2d 395, 242 P.2d 949 (1952), plaintiff and defendant entered into an agreement whereby Polizzi paid $12,500.00 for half interest in a tomato cannery which was to be erected, and Porcaro promised to supervise all the necessary work and to supply and deliver the certificate of stock to Polizzi. In the year or two following this agreement, Polizzi did not engage in any conduct in regard to the erection of the cannery, although he may have visited it once. The Court held the transaction to be a joint venture and not a corporate stock subscription agreement.

One of the major cases developing the concept of joint venture is that of Oakley v. Rosen, 76 Cal.App.2d 310, 173 P.2d 55 (1946). The defendant Rosen had acquired the right to produce a play. The plaintiffs supplied a portion of the money needed for the production in return for specified percentages of the profits. When the play proved unsuccessful, plaintiffs sued for rescission on the ground that the transaction was void because no permit had been obtained for the sale of the interest to them. The plaintiffs had invested money but had not in any way controlled the undertaking. The Court held the transaction involved possessed "every element requisite to such (a joint venture). Rosen had acquired by contract the right to exploit a play. He was in need of finances with which to proceed with his plans. Appellants supplied a portion of the funds on the conventional basis of taking their pro rata shares of the profits to be earned from the specific enterprise which was to be conducted by appellee as the producer. Because it does not differ in its essentials from joint ventures for mining, building, promotion and other undertakings, it can be nothing but an agreement for a joint adventure. The fact that appellee was to produce the play without the assistance of appellants makes it nonetheless a joint venture. Many successful enterprises owe their pronounced achievements to the program and direction of a single mind." (Citation omitted.) *Oakley, supra,* at 313–314, 173 P.2d at 57.

Under the terms of the contract in our case, plaintiffs were to receive daily drilling reports, they were welcome at the drilling sites, they were not billed for the cost of production after it was undertaken, but provided the cost of drilling in proportion to their interest prior to the undertaking of the drilling. I conclude that the plaintiffs had a right to control the drilling operations, but deferred exercise of this control and chose to rely on the greater expertise of the defendant. In light of the interpretation of the term "right to control" and the general concept of joint venture developed in the cases cited above, it seems clear that a joint venture existed in the present suit.

The cases in which transfer of an interest in an oil and gas lease was held to require a permit from the California Corporations Commissioner involved factual situations that were very different from that in the present case. In Oil Lease Service, Inc. v. Stephenson, 162 Cal.App.2d 100, 327 P.2d 628 (1958) and Moore v. Stella, 52 Cal.App.2d 766, 127 P.2d 300 (1942), the transaction at issue consisted of an assignment by the defendants of some of the interest they possessed in oil and gas leases covering very large amounts of land. There was no intention to have the purchasers themselves drill for oil and gas and there was certainly no intention that these purchasers would ever participate together with the defendants in such a venture. The court in each of those cases correctly held the transaction to be the sale of security which required a permit.

People v. Sidwell, et al., 27 Cal.2d 121, 162 P.2d 913 (1945), is another case in

which the sale of an interest in oil and gas production was held to require a permit. Defendants were in the process of digging a well and in need of money. Their neighbor lent them $5,-000.00 to complete a deeper digging of the well in exchange for a personal note with 6% interest or, if the defendant struck oil, for 5% of the oil and gas produced. The arrangement was clearly not that of a joint venture. There was no sharing of losses. Profits were to be shared only if oil were struck; if the defendants received a profit for any other reason—for example, by selling the lease to a third person—the neighbor would have no share in the profit. The maker of the loan incurred no risk (other than that the loan might not be repaid) as a result of the undertaking. Clearly none of the requirements for a joint venture present in the case at bar existed in *Sidwell.*

In support of their contention that no joint venture exists in the case before me, plaintiffs rely heavily on Goldberg v. Paramount Oil, 143 Cal.App.2d 215, 300 P.2d 329 (1956). In that case plaintiff and defendant entered into an "operating, maintenance and drilling agreement" whereby plaintiff agreed to pay $3.00 per foot for drilling wells at a location to be designated by defendant Paramount. Payments were due from plaintiff when a log for a completed well was furnished to him. If oil was discovered, Paramount agreed to pump, maintain, heat and sell the oil, and for doing all such work plus furnishing all labor, materials and equipment, Paramount would retain 75% of the money received on the oil. Payment of oil royalties were to be made by Paramount to plaintiff. The Court described the relationship as follows: "Defendant is a corporation. Defendant's president, Hefter, drew the contract. Plaintiff was engaged in the plywood lumber business, not in the oil business. He was not responsible for any of defendant's obligations. He had no knowledge or control as to when or how wells would be drilled or put on production. He had no rights, duties, or obligations other than the payment of the money on receipt of logs for completed wells. Under the contract, and in fact, defendant maintained dominion and control over the oil development and the expenditure of the money paid by plaintiff. Plaintiff had none. The contract specifically says the moneys to be paid plaintiff are 'oil royalties.' The contract did not create a joint venture." *Goldberg, supra,* at 220, 300 P.2d at 332.

Plaintiffs' reliance on the *Goldberg* case seems unmerited. The operating agreement entered into in *Goldberg* suggests a relationship between the parties which is significantly different from the relationship created by the contracts in the present case. In *Goldberg,* the plaintiff was not responsible for any obligations incurred by the defendant. Dr. Vicioso and Dr. Jorge, on the other hand, were responsible for monetary obligations incurred by Watson on behalf of the drilling enterprise. In *Goldberg,* the plaintiff had no knowledge or control as to when or how wells would be drilled. Dr. Vicioso and Dr. Jorge did have such control; in fact, they were the ones to decide that there were to be four wells involved in this venture and they specified the date by which drilling of the wells had to begin. Whereas the plaintiff Goldberg paid Paramount a flat per foot rate for drilling wells, plaintiffs in this case were to "participate in (their) proportionate share of the expense of setting pipe, drilling and pulling the pipe." Finally, in *Goldberg,* Paramount Oil was responsible for paying the landowner his royalties, while in the instant case the agreement provided that each doctor's interest was burdened by the landowner's royalties. In view of these factual distinctions, I do not believe that the *Goldberg* opinion requires me to conclude that a joint venture did not exist in the present case.

■ In determining whether the flexible criteria for a joint venture have been met, the Court should be guided by the intentions of the parties as evidenced by the facts. Stilwell v. Trutanich, *supra,* at 618, 3 Cal.Rptr. 285; Goldberg

v. Paramount Oil, *supra*, at 224, 300 P.2d 329 (concurring opinion of Shinn, P. J.). The facts in the present case indicate that Dr. Vicioso and Dr. Jorge were in need of a tax shelter and solicited defendant Watson through their accountant Kaleidas. They specified the type of enterprise they sought to engage in and the timetable for certain operations thereunder. Each of the three parties, defendant and plaintiffs, possessed fractional interests in four separate leases and each possessed a "working interest" in the oil production in proportion to their interest in the leases. All parties were potentially involved in the activity on the leases on a day-to-day basis. Defendant Watson was on the sites; however, plaintiffs could receive daily reports on the drilling or view it personally whenever they desired. On the basis of these facts, it seems clear to me that the intention of the plaintiffs was not to invest money in Watson's personal venture, but to enter into a joint venture in which all three parties participated.

Since we conclude that the transaction was a joint venture, defendant's assignment of the lease interests to plaintiffs was not unlawful, despite the lack of a Section 25500 permit.

The plaintiffs contend that the transaction with Watson is also void because in violation of Section 5 of the Securities Exchange Act of 1933 (15 U.S.C. § 77e), which prohibits the sale of a security without a registration statement having been filed with the Securities Exchange Commission. The registration statement requirement, like the California permit requirement, is not absolute. Under federal law, securities transactions which do not involve a public offering are exempt from the registration statement requirement. Section 4 of the Securities Exchange Act of 1933 (15 U.S.C. § 77d).

■ Whether or not an offering is public depends upon the factual circumstances of the particular case and a combination of factors, including the relationship between the purchaser and the seller, and the nature, scope, size and manner of the offering. The greater the number of persons to whom a security is offered for sale, the more likely that the offering will be held to be public. SEC v. Royal Hawaiian Management Co. (1967, D.C.Cal.) C.C.H. Fed Secur.L. Rep. ¶ 91982. One Court has indicated that an offering to less than 25 persons will be presumed to be private. Collier v. Mikel Drilling Co., 183 F.Supp. 104 (1958, D.C.Minn.). The larger the size of the offering, the more likely it will be public. Campbell v. Degenther, 97 F.Supp. 975 (1951, D.C.Pa.); *Collier, supra.* If the offering, although small, is part of a series, or if there are a large number of units in the offering, thus putting the seller on notice that they could easily be resold by purchasers to broad classes of the public, the initial offering may be held to be public. Direct negotiations are more likely to be nonpublic than are those transacted through the machinery of public distribution such as the national exchanges. The fact that the investor rather than the seller initiates the transaction indicates that a private offering is involved. Garfield v. Strain (10th Cir., 1954), 320 F.2d 116; 6 A.L.R. Fed. 536.

■ In the case at bar, the transaction was initiated by the investors, Drs. Vicioso and Jorge, and consummated through direct negotiations. It was a modest offering extending to two people only. Although the line between public and private offerings is not always very distinct and shifts on the basis of the facts of the transaction, it is clear that the transaction involved in the present case falls in the area of private offering. Therefore, defendant's assignment of the lease interests to plaintiffs did not violate the federal securities laws despite the absence of a registration statement.

■ Furthermore, even if the sale were in violation of Section 5 of the Securities Exchange Act of 1933 (15 U.S.C. § 77e), giving rise to a civil action under Section 12(1) of the Act (15 U.S.C. § 77l(1)), plaintiffs would be barred from recovery by the applicable statute of

limitations. Under Section 13 of the Act (15 U.S.C. § 77m), no action can be maintained to "enforce a liability created under section 77l(1) * * *, unless brought within one year after the violation upon which it is based." Inasmuch as the sale at issue occurred in December of 1967 and suit was filed in 1969, the action for violation of Section 5 (15 U.S.C. § 77e) is barred by the statute of limitations.

Plaintiffs have also sought recovery under the Securities Exchange Acts of 1933 and 1934 on the ground that defendant made a material misrepresentation of fact in connection with the lease assignment by assuring plaintiffs that they would receive returns from the oil production in the amount of their original investment within 5 years. However, since five years have not yet passed and plaintiffs refused to advance the money necessary for drilling within 3 months after their initial investment, there is no way for this court to determine whether or not defendant Watson's alleged statement, even if made, was untrue. Therefore, this issue must be resolved in favor of the defendant.

It is ordered that judgment be entered in favor of defendant.