George T. COLLIER, James A. Thompson, Rose W. Thompson, A. L. Larson, Hjalmer L. Swanson, Minnesota Petroleum Company, Merle O. Anderson and Margaret M. Anderson, Plaintiffs,

v.

MIKEL DRILLING COMPANY, the Mikel Company, Oscar E. Chambers, Cliff Pierce and Charles E. Timm, Defendants.

Civ. A. No. 5416.

United States District Court
D. Minnesota,
Fourth Division.

March 27, 1958.

Earl H. A. Isensee, Minneapolis, Minn., for plaintiffs.

Harry H. Peterson, Minneapolis, Minn., and Doyle Watson, Drumright, Okl., for defendants Mikel Drilling Co., the Mikel Co. and Oscar E. Chambers.

John T. Gibson, Tulsa, Okl., and Bundlie, Kelley & Maun, St. Paul, Minn., for defendant Cliff Pierce.

Wheeler, Fredrikson & Larson, of Minneapolis, Minn., for defendant Edna F. Timm, special administratrix of the estate of Charles E. Timm, deceased.

NORDBYE, District Judge.

This cause came on for trial before the Court without a jury.

The action arises under the Securities Act of 1933, as amended, 15 U.S.C.A. § 77a, et seq. Jurisdiction is claimed in this Court under Section 77v of the Act. Defendants, other than Charles Timm, now deceased, are residents of the State

of Oklahoma. After the death of Charles Timm, Edna Timm, his wife, special administratrix of his estate, was substituted as his representative. Suit is brought in Minnesota in that plaintiffs contend that the sale or offer to sell unregistered and unexempt securities was made in this State and the securities involved are fractional, undivided interests in oil leases in the State of Oklahoma. The interests were issued upon three separate tracts of land. The plaintiffs are purchasers of the fractional interests involved and they seek to recover herein the moneys paid therefor, together with certain operating expenses which they expended. They contend that the fractional interests are securities within the concept of Section 77b(1) of the Securities and Exchange Act. It is stipulated that such interests were not registered under the Act. Defendants, however, claim that registration was not necessary, and if it was, the transactions were exempt under the Act.

A somewhat detailed recital of the material facts disclosed by the evidence should be set forth. In March, 1954, or thereabouts, Mikel Drilling Company acquired oil and gas leases upon certain property in Oklahoma known as the Pizzaro-Dick lease, hereafter referred to as Tract No. 1. In April, 1954, Mikel Drilling Company assigned a three-fourths working interest in this lease to the Edcliff Oil Company, a partnership composed of one Paul Edwards and defendant Cliff Pierce. Shortly afterwards, Edcliff Oil Company sold some fractional interests in the lease to certain acquaintances of the individuals composing the partnership, who lived in the State of Illinois. The details or circumstances of these sales were not disclosed in the evidence with sufficient clarity or definiteness so as to make any finding except that interests to some fourteen such acquaintances were transferred. There is a lack of any satisfactory evidence from which it can be determined whether these transactions were within the ambit of the Securities and Exchange Act in question. Later, and before the instant transactions were consummated, the Edcliff Oil Company was dissolved.

Plaintiffs Thompson and Collier, residents of Minneapolis, entered the scene with respect to Tract No. 1 early in 1955. Thompson was an acquaintance and lodge brother of defendant Timm. Timm was a real estate broker in Minneapolis, but he also participated in oil ventures on a limited scale. Thompson apparently made his living from investments and from time to time informed Timm that he, Thompson, would be interested in an oil lease and requested Timm to let him know if he learned of any opportunity along that line. Timm informed him that he would let him know if and when he ran across anything by way of an oil or gas lease which might seem attractive. Some time thereafter Timm met the defendant Pierce, with whom he was acquainted, in Claremore, Oklahoma, in connection with a business transaction not involved herein. At that time, remembering Thompson's interest in a good "oil deal", Timm mentioned to Pierce that he was interested in acquiring an oil and gas lease for his friend. Apparently Pierce was holding an interest in Tract No. 1 as an investment for himself and had no lease at that time to sell, but on March 28, 1955, he wrote a letter to Timm in which he offered to sell an undivided ¹⁄₁₆ interest in the oil and gas lease in Tract No. 1. In this letter he set forth the status of the lease with respect to the three operating wells thereon and two more which were to be drilled within the next 90 days. The price asked was $19,000. Upon receiving the letter, Timm notified Thompson, and the latter requested that he be permitted to bring his friend, Collier, with him when the transaction was to be discussed with Timm. Pierce's letter was read to Thompson and Collier, and later another letter from Pierce giving additional details at the instance of Timm also was presented to Thompson and Collier. Timm, however, was insistent that these two men should decide for themselves whether they wanted to buy the lease interest, and he informed

them that they should not decide that question until they had gone to the properties in Oklahoma and made their own investigation and independent decision. Thereafter, Timm, Thompson and Collier drove to Tulsa, Oklahoma. Pierce showed Tract No. 1 and the wells thereon to Thompson and Collier and introduced them to the defendant Chambers, who was an officer of the operator of the lease. Production records were checked by Thompson and Collier, and they made a complete investigation of all factual matters which might determine whether or not Pierce's offer should be accepted. A day or two thereafter, the sale was consummated in Tulsa, Oklahoma, upon the execution of the proper documents and a payment of $2,000 was made by the purchasers on the purchase price of $19,000. Subsequent to their return to Minneapolis, Thompson and Collier made their checks payable to Pierce for the balance, which checks were mailed by Timm to Pierce at Tulsa. Later, Pierce paid Timm a $1,000 brokerage fee for bringing the parties together. Timm received nothing from Thompson and Collier in connection with the transaction.

The next sale of an interest in Tract No. 1 involved the plaintiff Merle O. Anderson. He was also a friend of Timm's, residing in Minneapolis. Apparently when Timm was in Tulsa on the Thompson-Collier transaction, he learned from Pierce that the Mikel Drilling Company had a $\frac{1}{16}$ interest in Tract No. 1 which it was willing to sell. Defendant Chambers was President of the Mikel Drilling Company. Anderson and Timm had participated in oil transactions together on prior occasions and Anderson had indicated to Timm that he might be interested in going into some oil deal if Timm knew of anything that "looked good". After Timm's return from Tulsa, he informed Anderson of the availability of the $\frac{1}{16}$ interest held by the defendant Mikel Drilling Company. Anderson evidently was willing to purchase the interest in the lease solely upon Timm's representations, but Timm insisted that Anderson satisfy himself personally as to the quality of the lease, and thereafter Anderson and Timm drove to Tulsa. Although Pierce had no interest in the transaction at that time, Timm contacted Pierce upon arriving in Tulsa and requested that Pierce take Anderson to the lease in question in that Timm was not acquainted with the exact location. Pierce took Anderson to the lease situs and explained to him the operations thereon. Up to this time, Chambers apparently was unaware that Timm had taken Anderson to Tulsa for the purpose of interesting him in buying a fractional interest in the lease. The next morning, however, Pierce, Anderson and Timm went to Chambers' office where Anderson conferred with Chambers. After the conference between Anderson and Chambers, the former purchased a $\frac{1}{16}$ interest from Mikel Drilling Company for $19,000. The transaction took place in April, 1955, and it appears that both Timm and Pierce received a commission from Chambers on this deal.

Practically one month after this transaction was completed, Timm had a conversation with one Walter P. Wolfe, a Minneapolis attorney, and President of the Minnesota Petroleum Company, regarding the possibilities in an oil lease on Tract No. 1. This conference was prompted by a wire that Timm had received from Chambers that a $\frac{1}{32}$ interest in Tract No. 1 was available and for sale. Wolfe and Timm had been friends of long standing, and Timm knew of Wolfe's interest in oil transactions because of the latter's interests in the Minnesota Petroleum Company. Thereafter, these two men drove from Minneapolis to Tulsa, where Wolfe met a Mr. Burns, a geologist for Mr. Chambers. Burns took Wolfe to Tract No. 1 where various operative matters were discussed between Wolfe and Burns, and Wolfe being apparently satisfied that he should make the investment, purchased a $\frac{1}{32}$ interest for $10,000. The assignment ran from Mikel Drilling Company to Minnesota Petroleum Company. It appears that Timm received a five per cent commission or brokerage fee from Mikel

Drilling Company for negotiating this transaction.

The last two sales of interests in Tract No. 1 were made to plaintiffs Larson and Swanson. These two men were likewise Timm's friends of long standing and had been associated with Timm in business deals. According to the deposition testimony given by Timm, he received telegraphic advice from either Pierce or Chambers that another interest in Tract No. 1 had become available. Larson and Swanson did not care to go to Tulsa to examine the oil properties, but they did execute a document to authorize Timm to act as their agent in the transaction. Apparently Larson and Swanson were acquainted with Mr. Wolfe, who had visited the situs of the lease, and they stated they were willing to rely upon Wolfe's report in that he was their friend and attorney. In any event, each purchased a 1/32 interest for $10,000. This purchase was made in Minneapolis through Timm and the purchase price was remitted by Timm to Chambers. However, Timm retained $2,000 as a brokerage fee when forwarding the balance to Chambers. It appears that this assignment to Larson and Swanson was dated May 31, 1955. When forwarding the balance to Chambers in connection with the Larson and Swanson deal, Timm wrote in part as follows:

"Mr. Chambers, out of these funds you are to take care of C. M. Pierce, as per our conversation over the telephone a couple of days ago, you mail whatever papers you have, which are required to convey a good merchantable title to the working interest purchased by Mr. Swanson and Mr. Larson to me, should there be any papers that these fellows should sign to complete the transfer, I'll see that it is taken care of at this end."

It appears that at or about this time Timm also negotiated the sale of a 1/32 interest in Tract No. 1 to his neighbor, one C. J. Brisco, but the latter has not made any claim for recovery herein on that sale.

In the early summer of 1955, Timm received word from Chambers that the Mikel Company, of which Chambers was also President, wished to sell fractional interests in another lease referred to herein as the Garvin County lease, or Tract No. 2. In this tract, Anderson purchased a 3/16 interest for $5,085; Thompson and Collier each purchased a 1/16 interest for $1,695; and Wolfe purchased a 1/32 interest for $847.50. However, Wolfe is not attempting to recover for this transaction in this suit. None of the plaintiffs traveled to Oklahoma in connection with the purchase of interests in Tract No. 2. All negotiations were carried on in Minneapolis by Timm through the mails, telephone or telegraph. Apparently Timm received a 1/32 interest in Tract No. 2 for his services as a middleman or broker. The evidence also indicates that Pierce received a 1/32 interest in Tract No. 2 from the Mikel Company, but both Pierce and Chambers contend that such conveyance to him was in consideration of services other than those connected with the sales in Tract No. 2, which were made to these plaintiffs. It does not appear that Pierce performed any services in connection with the sales made in Tract No. 2, and hence it is fair to find that the interest that he obtained in that tract was in consideration of services other than in connection with the sales made to the three plaintiffs in question.

It was in September, 1955, that Timm received word from Chambers or Burns by telephone or mail that an interest was for sale in what is termed the 1,000 acre tract or the 1,000 acre lease, or Tract No. 3. A 1/16 interest was sold in this lease by Chambers to the plaintiff Thompson for $2,000. Apparently no other person was offered this fractional lease, although Collier was with Thompson when the information was given to the latter by Timm. It would appear that Timm received his usual five per cent commission for his services in connection with this transaction. There is a dispute as to whether Timm exacted more than five per cent commission on

the Larson and Swanson transaction, but that question is not important herein.

In each instance in connection with the sales recounted above, plaintiffs agreed to pay operating and development costs apportioned ratably to their interests in the leasehold. The precise reasons why the leases have not paid the anticipated return is not fully explored in the record. However, it seems evident that the operating and development costs nearly equalled or exceeded the income from the sale of crude oil obtained from the properties, and as a result plaintiffs have concluded that the leases hold no immediate prospect of ever becoming a paying proposition. It should be stated, however, that plaintiffs allege no fraud or over-reaching or misrepresentation. They base their claims exclusively upon the alleged liability arising from defendants' failure to register the securities in question. The issue of liability, among other reasons, becomes complicated and involved because of the rather loose and undefined relationship between the parties who are named as defendants.

Fractional undivided working interests in oil leases are included within the definition of the term "security" by the express language of 77b(1), 15 U.S.C.A. Moreover, it seems clear that this Court has jurisdiction. Section 77v, 15 U.S. C.A., provides, in part,

"(a) The district courts of the United States * * * shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, * * *. Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

■ There is no doubt that negotiations started in Minnesota. The negotiations amounted to offers. The term "sale", as used in Section 77v includes an offer to sell or solicitation of an offer to buy as well as the consummation of a sale. Whittaker v. Wall, 8 Cir., 226 F. 2d 868.

■ The only jurisdictional question remaining is whether or not defendants violated Section 77e in making the offers or completing the sales. 15 U.S.C.A. § 77e(a) states,

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell * * * such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

If any of the means mentioned in this section were used in selling, offering to sell, or in delivering the securities herein under consideration, the defendants fall within the scope of the Securities Act. It is obvious that these methods were used to some extent. In the Tract No. 1 sales to Thompson, Collier, Wolfe and Anderson, Timm transported these men from Minneapolis to Tulsa in his automobile. This fact alone brings defendants under Section 77e so far as these four plaintiffs are concerned. Timm never purported to act as agent for these men, and his interstate transportation of them is attributable to some extent, at least, to one or more of the defendants. The mails were used in making the Tract No. 1 sales to Larson and Swanson. It is unimportant whether or not Timm was acting as their agent so far as the jurisdictional question is

concerned. Likewise, in the Tracts Nos. 2 and 3 sales, the mails or some form of interstate communication was necessarily utilized by the defendants.

When we come to the question as to whether these transactions come within the exemptions of the Act and whether there was a public offering within the purview thereof, it would seem that that question may not be free from some difficulty. However, the sales made by the Edcliff Company to certain residents in Illinois consist of separate transactions wholly disconnected and unrelated to the present sales, and there is an utter absence of any evidence or reasonable inferences to be deduced from the record which would justify a finding that such sales were made in violation of the Act. At the time of the sales herein, the Edcliff Company had been dissolved and the only former partner, Pierce, of whom there is any evidence, held an interest in Tract No. 1 as a personal investment when Timm first approached him with reference to the interest of Thompson in oil and gas leases. We are in fact dealing with isolated transactions with various individuals concerning three separate parcels of land. When Pierce consented to sell the lease interest available for Thompson and Collier and closed the transaction with them, that deal ended any further issuance by Pierce of any fractional interests in Tract No. 1. When Mikel Drilling Company made available to Anderson through Timm an interest in Tract No. 1, such offer was in no way related to, or connected with, the alleged issuance of securities in the transactions involving Pierce, Thompson and Collier. Similarly, the sales of fractional interests to the Minnesota Petroleum Company and to Larson and Swanson were independent transactions between holders of oil leases and those who desired to obtain such interests for their personal investment. Obviously, Timm, attracted by the commissions he was obtaining, took the initiative in ascertaining from Chambers from time to time whether additional interests were available in Tract

No. 1 if he, Timm, could produce purchasers. But each of the transactions nevertheless was a separate, disconnected purchase between an owner of a fractional interest and an individual buyer. The invitations stemmed from Timm and not from the owner of the fractional interests. It was Timm who induced and encouraged the offers, not Chambers or the companies which he allegedly controlled. In other words, it was the plaintiffs Thompson, Collier, Anderson and Wolfe, through Timm, who in effect solicited these purchases, and in the case of Larson, Swanson and Brisco, the latter appointed Timm as their agent to obtain the fractional interests which they purchased. And when we consider the sales in Tract No. 2, we of course not only have separate interests sold in a separate tract by a different company (the Mikel Company), but a dealing in a security which has no relation to those sold in Tract No. 1, except that the sales in Tracts Nos. 1 and 2 were fractional oil interests. So far as the one isolated sale in Tract No. 3 is concerned, which was sold by Chambers to Thompson, again the same observation may be made. There is no showing or even contention that the Mikel Drilling Company and the Mikel Company were not bona fide corporations. Chambers' alleged control of these two corporations does not impair their legal entity. There is no showing that these two corporations existed merely as a front for Chambers. Consequently, under the evidence here, the Mikel Drilling Company, the Mikel Company, and Chambers as an individual, must be considered as separate and distinct issuers of securities if that legal conclusion is justified from the evidence.

It is true that we must commence with the premise that the use of interstate communication methods and instruments in selling unregistered securities is unlawful. But under Section 77d(1), recovery can be predicated only upon sales made by dealers, underwriters or issuers. Plaintiffs contend that Timm acted as a dealer in making the sales; that as to Tract No. 1 sales, Pierce acted as an

underwriter; and that Chambers and the two Mikel companies with reference to their sales, acted as issuers. Pierce's alleged position as to the sales in Tracts Nos. 2 and 3 is not made clear by the plaintiffs. The statutory definitions of these terms are found in Section 77b (4) (11) and (12), 15 U.S.C.A.:

"(4) The term 'issuer' means every person who issues or proposes to issue any security; * * * except that with respect to fractional undivided interests in oil, gas, or other mineral rights, the term 'issuer' means the owner of any such right or of any interest in such right (whether whole or fractional) who creates fractional interests therein for the purpose of public offering. * * *

"(11) The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

"(12) The term 'dealer' means any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person."

It does not seem necessary to determine whether the evidence justifies a finding that these defendants may be catalogued as underwriters, dealers and issuers, though obviously it is difficult to label them as plaintiffs urge without resorting to a certain amount of artificiality. For instance, strictly speaking, Timm was not a dealer in securities. Actually he was a middleman or a broker, dealing between an investor who wanted to buy and an investor who wanted to sell. Moreover, it seems wholly unrealistic to consider Pierce as an underwriter by reason of the one sale that he made to Thompson and Collier of an interest he personally held in Tract No. 1. Pierce's relation to the other sales did not make him a dealer within the meaning of the Act. He was not in the business of "offering, buying, or selling, or otherwise dealing or trading in securities issued by another person." To conclude that the incidental service performed by Pierce in Oklahoma in connection with the other sales at the instance of Timm constituted him as a dealer within the meaning of the Act would seem to be contrary to and outside of the intent and purposes of the Act. And although the Mikel Drilling Company, the Mikel Company, and Chambers may be considered to be issuers if these transactions are not otherwise exempt from the Securities and Exchange Act, we cannot escape the fact that in reality these sales were sales by a holder of an investment to one who desired to buy an investment. Certainly, there was little likelihood that the securities so sold herein would be sold by these plaintiffs to the general public.

It would seem, however, that the controlling question in this controversy is whether or not the sales of these securities were part of a public offering and to determine whether or not the defendants have sustained the burden of proof in establishing that they were a private offering rather than a public offering. Concededly, the burden rests upon them in this regard. Securities & Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494. Plaintiffs here, so far as this rec-

ord is concerned, are the only members of the public outside of Brisco to whom an offering of securities was made. True, there may be others who held fractional interests in Tracts Nos. 1, 2 and 3. But there is no support for a finding that such holdings were in any way a part of any public offering within the meaning of the Act. It would be idle speculation to assume that the sales made by Edcliff Company perchance may have violated the Securities Act. The record is completely silent as to the circumstances of these sales and they took place within a year prior to the present transactions. And defendants should not be required to delve into, explain or negative any suspicion of illegality as to other transactions involving those tracts when the facts and circumstances do not suggest that they were tainted with any illegality under the Securities Act.

 The public offering concept should be considered in light of the purposes of the Securities Act. One of its purposes was to protect investors by promoting full disclosure of information necessary for informed investments. The line of demarcation between a public offering and a private offering may not at all times be too clear. It may be admitted that the mere fact that we have here a relatively few offerees is not necessarily determinative of the question. But in that regard, reference may be made to the opinion of the general counsel in Securities Act Release 285 (1935), in that this statement is helpful in affording some tangible conception as to what may be a private offering as distinguished from a public offering. In this release, among other things, the general counsel reiterated a prior Commission's opinion, as follows,

" * * * that under ordinary circumstances an offering to not more than approximately twenty-five persons is not an offering to a substantial number and presumably does not involve a public offering."

The opinion sets forth certain additional criteria which may be properly considered in determining whether or not the offering herein be a public or a private one. The following may be noted:

"1. *The number of offerees and their relationship to each other and to the issuer.* * * *

"Again, in determining what constitutes a substantial number of offerees the basis on which the offerees are selected is of the greatest importance. * * * However, I have no doubt but that an offering restricted to a particular group or class may nevertheless be a public offering if it is open to a sufficient number of persons.

"2. *The number of units offered.* If the denominations of the units are such that only an insubstantial number of units is offered, presumably no public offering would be involved. But where many units are offered in small denominations, there is some indication that the issuer recognizes the possibility, if not the probability, of a distribution of the security to the public generally. The purpose of this exemption of nonpublic offerings would appear to have been to make registration unnecessary in these relatively few cases where an issuer desires to consummate a transaction or a few transactions and where the transaction or transactions are of such a nature that the securities in question are not likely to come into the hands of the general public.

"3. *The size of the offering.* It should be noted that the exemption of Section 4(1) is of transactions by an issuer not involving any public offering. * * * Hence I feel that this exemption was intended to be applied chiefly to small offerings, which in their nature are less likely to be publicly offered even if redistributed.

"4. *The manner of offering.* * * Consequently, I feel that transactions which are effected by direct negotiations by the issuer are much

more likely to be nonpublic than those effected through the use of the machinery of public distribution."

The Supreme Court in Securities & Exchange Commission v. Ralston Purina Co., supra, 346 U.S. at page 125, 73 S. Ct. at page 984, did state that "the statute would seem to apply to a 'public offering' whether to few or many." But in so stating the court had in mind whether the "particular class of persons affected needs the protection of the Act." The court made it clear that "An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.' "

In determining whether or not these isolated security transactions with which we are concerned should be translated into a public offering, the number of offerees, the circumstances surrounding the transactions, the relationship between the investors and their friend, Timm, their experience in business, and particularly the oil business, are all factors which should bear upon the question as to whether this was a public or private offering of securities. The teachings of the Ralston Purina Co. case do not suggest that the present situation should be classified as a public offering within the intent and purview of the Act. There, the employee offerees were not executive employees of the company who had access to the necessary information which would render them informed investors. Rather, they were in the lower echelon of employees who lived in various areas throughout the United States, and who under the circumstances could not be presumed to have informed knowledge as to whether any investment in their company's common stock would be prudent or otherwise. In that case there was an absence of any showing that the employees had access to sources of information which would render them informed investors. Some 1,088 employees had purchased nearly $2,000,000 worth of stock in the company over a period of some four years before the Commission sought to enjoin the non-registered offering which precipitated the litigation that ultimately came before the Supreme Court. And as we analyze the situation herein, we find that as to Tract No. 1, there was one offer by Pierce and four by the Mikel Drilling Company; as to Tract No. 2, three offers were made by the Mikel Company; and as to Tract No. 3, one offer was made by Chambers. All these tracts were separate, distinct oil projects having no relation to one another and lying in different areas. Certainly, no one will question the fact that these investors were able to "fend" for themselves. They all dealt through Timm, their friend of long standing. They were all afforded a full opportunity to investigate all of the facts surrounding the investments which they made, and all of them were businessmen of mature experience. It is difficult to reconcile one's concept of a public distribution of securities with the more or less fortuitous connection between the sales herein. As the court stated in Campbell v. Degenther, D.C., W.D.Pa. 1951, 97 F.Supp. 975, 977,

"At most, the transactions herein conducted were a close-knit arrangement among friends and acquaintances on a purely personal basis, without any systematic scheme or promotion program for sale of said securities to the general public or any select group sufficient in size to fall within the province of a public offering."

Plaintiffs question that the defendants have sustained the burden of proof in establishing that these transactions do not constitute a public offering. It is urged that the defendants have failed to explain and analyze all the background with reference to any other holders who may have acquired interests in these three tracts. But plaintiffs' attempt to tie in other transactions in which these defendants may have been involved with the present deals is devoid of any persuasive support in the record. As the Court has indicated heretofore, defendants should not be required to negative transactions as to which there is no evi-

dence or inference of illegality. For instance, there is no showing that as to Tracts Nos. 2 and 3, anyone held fractional interests except Chambers and the Mikel Company when the sales were made to plaintiffs of interests in those tracts. And moreover, there is no evidence that after the sales were made to the plaintiffs, additional sales were made to any other members of the public. No hard and fast rule can be laid down as to the quantum of proof necessary to establish that sales of securities do not constitute a public offering. But if the purposes of the Act are kept in mind and a realistic and common-sense analysis is made of all these transactions, there should be no difficulty in determining that defendants have sustained the burden of proof in establishing that neither these sales nor any one of them constituted a public offering within the meaning of the Act. This Court, after due consideration, has no hesitancy in arriving at that conclusion.

Finally, consideration must be given to the Eighth Circuit decision in Whittaker v. Wall, supra. However, that case is not authority on the basic issue in this matter because the public offering concept was not before the court. In that case, one Wagner, a resident of Nebraska, was employed as a representative of the issuer of the securities, a Delaware corporation, whose principal place of business was in Kansas. He was employed to sell oil and gas leases on a commission basis in Nebraska. The court merely passed upon the jurisdictional issue, the persons liable, and the relief to be afforded. The question as to whether the transaction involved a public offering and hence was exempt under the Act, was not before the court and was not decided by the court. And it is fair to assume that Wagner was hired in Nebraska by the issuer of the securities for the sole purpose of making a public offering of oil and gas leases. That situation, of course, is not to be found in the case at bar.

It follows from the foregoing that the Court has concluded that the plaintiffs are not entitled to recover herein, and judgment should be entered for the defendants with costs. Findings of fact and conclusions of law consistent herewith may be presented upon ten days' notice. Exceptions are reserved.