DONALD A. JACKSON, JR. AND MARILYNN JACKSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jackson v. Commissioner
Docket No. 3369-79.
United States Tax Court
T.C. Memo 1981-594; 1981 Tax Ct. Memo LEXIS 150; 42 T.C.M. (CCH) 1413; T.C.M. (RIA) 81594; October 14, 1981. Eliot S. Nahigian, for the petitioners. Carol K. Muranaka, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' *156 Federal income taxes: Year
Amount
1973
$ 6,770
1974
987
The issues for decision are (1) whether to grant petitioners' oral motion to dismiss one of the issues in this case, (2) whether the petitioners realized any taxable gain on the transfer of a joint venture interest to a corporation owned by petitioner Donald Jackson in 1973, (3) whether the petitioners are entitled to deduct certain rental expenses for their Shell Beach condominium in the years 1973 and 1974, and (4) whether respondent correctly decreased petitioners' allowable deduction for medical expenses under section 213. [1]
FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. Donald A. Jackson, Jr. and Marilynn Jackson (petitioners) are husband and wife, who resided in Fresno, California, at the time they filed their petition in this case. Petitioners filed their joint Federal income tax returns for the *157 years 1973 and 1974 with the Internal Revenue Service in Fresno, California. Donald A. Jackson (hereinafter called Jackson or petitioner) is, and was during the times of the events in question, an attorney with and partner to the law firm of Kimble, MacMichael, Jackson & Upton of Fresno, California. At the time of trial his field of specialization was in the area of taxation. [2]
Jackson owned a 50 percent interest in a joint venture with Living Environments, Inc. (LEI). The stock of LEI was controlled by Louis F. del Castillo (hereinafter Del Castillo). The joint venture was formed in 1972 to construct the Castle View apartments (Castle View) in Atwater, California, and to pursue certain other activities. On September 15, 1972, Del Castillo and Jackson signed a promissory note for a short-term gap loan from the Wells Fargo Bank of Fresno, California. The loan was arranged through Sonnenblick-Goldman, mortgage brokers. The loan was to pay capital costs of the joint venture not covered by other financing. Payments on this note were made by the joint venture. On December 31, 1972, the *158 balance owed was $ 49,900. This amount was reflected as a liability of the joint venture on its 1972 partnership return. The entire amount borrowed from the Wells Fargo Bank was paid in 1973 by the joint venture. Jackson initiated a device whereby his wholly owned corporation, Housing Specialists, Inc. (hereinafter called HSI), would act as his agent in business transactions. HSI was a previously-existing corporation involved in several of Jackson's other real estate ventures as well. The agency relation allegedly was created in order for HSI, and not Jackson, to appear on the records of the joint venture as a joint venturer. In this way Jackson attempted to avoid the appearance of personal competition with his law firm's clients, many of whom were in the construction business. An agency agreement, dated October 11, 1972, was drawn up between Jackson as "undisclosed principal" and HSI as agent. Petitioner continued to conduct business matters, but now signed his name as president of HSI, the agent for Jackson, the "undisclosed principal." Agent-HSI and LEI then secured a "permanent and construction" loan in the amount of $ 795,000 from Gibraltar Savings and Loan Association *159 of Beverly Hills, California. This loan was secured by a Deed of Trust dated October 11, 1972, and was signed by Del Castillo, as president of LEI and Jackson, as president of HSI. In conjunction with the loan, both corporations (agent-HSI and LEI) were parties to a Loan Settlement Statement, Impound Authorization, Insurance Authorization, and Certification Statement. In addition, Jackson personally guaranteed the loan. All these documents were signed on October 11, 1972. In a formal joint venture agreement between Jackson and LEI signed on November 17, 1972 the Gibraltar loan was recognized to be "on behalf of the [j]oint[v]enture." On the 1972 partnership tax return the Gibraltar loan was included as a liability of the joint venture, and the joint venture reported a loss of $ 36,222.51. Under the joint venture agreement losses and profits were to be shared equally. Thus, $ 18,111.26 was the partner's share allocated to Jackson, and he claimed a corresponding loss on his individual tax return. This loss consisted of the following joint venture expenses: Administrative Charge Paid
$ 2,000.00
Bank Service Charges
10.57
Insurance
1,800.00
Legal
4,000.00
Loan Fees
27,825.00
Taxes--Merced County
441.94
Merced Irrigation District
130.00
Miscellaneous Expense
15.00
Net Loss
$ 36,222.51
*160 There was no indication of the joint venture relationship on either the Gibraltar or the Wells Fargo loans. Although the joint venture was in existence, at least to the extent of planning for the Castle View project, the Wells Fargo note was executed before November 17, 1972, when the joint venture agreement was signed. The Wells Fargo note was not amended to reflect the joint venture's existence. Certain sections of the joint venture agreement described the relationship of the joint venturers to each other and to the joint venture itself. section 1.17 of the agreement concerned capital accounts of each joint venturer. It stated, in part, that the Wells Fargo loan was for the purpose of financing the joint venture and that: all such sums contributed to the Joint Venture shall constitute capital and shall be repaid to WELLS FARGO BANK prior to the distribution to a Joint Venturer or any principal shareholder or employee of the Joint Venturer of any income or net profits or any other amounts whatsoever * * * The next section, dealing with income accounts for the joint venture, explained that "each Venturer's share of any net loss [of] * * * the Joint Venture and profits *161 * * * received * * * shall be charged to his income account unless the Venturers agree to charge such loss to their capital accounts." A debit balance in an income account becomes "an obligation of [the] Venturer to the Joint Venture." Withdrawal of a venturer was permitted under this agreement, with the stipulation that liabilities with respect to financing were not to be reduced absent specific agreement. Any legal fees were to be paid to petitioner's law firm, which was retained to represent the joint venture. Section 1.26 of the agreement provided: "This Agreement shall be binding on the parties hereto, their respective stockholders, successors and assigns." In addition, responsibilities of each joint venturer were mapped out carefully in the agreement. Each venturer was given considerable managerial discretion under the agreement, although Jackson was primarily in charge of obtaining loans for their project. He was to establish initial contact with lenders, assist in the preparation and submission of loan packages and applications, supervise closing of the loans, and prepare documents connected with closings. LEI's only specifically enumerated duty with respect to *162 loans was to negotiate changes with the lender, if required. General responsibilities of both venturers included "[o]btaining a feasibility letter or loan commitment" and "preparation of documents for lender[s]." According to Exhibit A attached to the joint venture agreement, the joint venturers were to contribute fifty percent of all capital required for the project. The Gibraltar loan was acknowledged to be on behalf of the joint venture by the following statement in Exhibit A of the joint venture agreement: The parties hereto acknowledge and recognize that the loan commitment obtained by SONNENBLICK-GOLDMANon behalf of the Joint Venture was obtained in favor of LIVING ENVIRONMENTS, INC. and HOUSING SPECIALISTS, INC. Because the parties hereto do not wish to disturb the loan in any manner, the loan will be left in its present form and all bank accounts and documents of record will be left in a form consistent with the loan which will generally show title to the property, bank accounts and loan documents in the name of LIVING ENVIRONMENTS, INC. and HOUSING SPECIALISTS, INC. [Emphasis supplied.] On January 3, 1973, Jackson assigned his one-half interest in the *163 joint venture to HSI, and the October 11, 1972 agency relationship between HSI and Jackson was abolished. [3] Part of the statement of assignment states: DONALD A. JACKSON as holder of a fifty percent (50%) interest in a joint venture of LIVING ENVIRONMENTS, INC. and DONALD A. JACKSON hereby assigns, transfers, and conveys to HOUSING SPECIALISTS, INC.all of his right, title and interest in said joint venture as of January 1, 1973. [Emphasis supplied.] The assignment was unanimously accepted by the board of directors of HSI at a special meeting held on January 22, 1973. The minutes of this meeting indicate that Jackson considered the transaction a complete termination of his individual interest and a contribution to HSI's capital, as follows: MR. JACKSON explained that he was concerned that the present arrangement worked out in October of 1972 was not providing him with sufficient anonymity and that he therefore wanted to completely sever *164 his individual relationship with the joint venture and transfer his interest to the corporation as of January 1, 1973. He explained that he was making a contribution to the capital of the corporation and was not requesting that any additional stock be issued. Jackson made clear he wanted no part of the joint venture, and the joint venture continued in 1973 with joint venturers HSI and LEI. There was no attempt to identify any specific joint venture property for transfer. An undivided one-half ownership was all that was transferred. Following the assignment, HSI exercised all managerial powers originally delegated to Jackson in the joint venture agreement. Furthermore, HSI had authority to bind the joint venture in its capacity as a joint venturer. It had an equal right to possession of property for joint venture purposes. At no time were any objections voiced by LEI regarding the change in form. [4] Petitioner did not introduce any books, memoranda, or records of the joint venture into evidence, nor did he produce evidence of the worth of the Castle View project at the time of the transfer. Although petitioner made books and records available to the revenue agent at his initial *165 audit, he did not produce the partnership books when the agent requested them at a later time, after petitioner made additional claims regarding his contributions. Jackson and his wife acquired a 50 percent interest in a condominium in Shell Beach, California, on or about November 30, 1973. The condominium was part of the Spindrift Village development (hereinafter Spindrift). Shell Beach is a year-round beach resort area between Los Angeles and San Francisco and an easy journey from Fresno, where petitioners lived. Popular even in December, when the "clamming" tides are low, it provides vacationers and residents with a sunny contrast to the foggy valley area in nearby cities.
The purchase was motivated, in part, by a desire to placate Mr. Carskaddon, the major owner and developer of Spindrift, and an important client of Jackson's law firm. After trying unsuccessfully to get other members of Jackson's law firm to join with them in the purchase, petitioners found an attorney at another law firm to share equally with them in owning *166 the Spindrift unit as tenants in common. At the time of purchase the unit was substantially completed. Preparations for occupancy of the unit were made. Starting in late 1973 and continuing through March 1974, various furnishings were purchased or acquired for the unit. No receipts were produced to substantiate amounts or dates of purchase. Petitioners and their cotenants were free to use the unit at any time. During 1973, before the unit's completion, Jackson traveled to Shell Beach several times on law firm business, but did not occupy the unit on these trips. From late 1973 through 1974, petitioner traveled to his condominium several times to attend to furnishings for the unit. He sometimes was accompanied by his family on these visits. In January 1974, petitioner and his family stayed at the apartment for several days. Part of their visit was spent arranging the apartment and its furnishings. Jackson also spent time at the unit while attending a Spindrift homeowner's meeting, and used it for a two day period in March 1974 for a business meeting of his law firm. Petitioners arranged with Louise Hurley, a sales agent for Spindrift, to find renters for the unit. She *167 only arranged for rentals in the summer of 1974. The rental schedule for the condominium for 1974 was as follows: Dates
Gross
Commissions
Refunded
Net
Rented
Rent
Paid
Deposits
Rent
8/1 to
$ 350.00
$ 50.00
$ 75.00
$ 225.00
8/7
8/11 to
425.00
68.75
140.00
216.25
8/16
1 week in
September
350.00
50.00
75.00
225.00
Total
$ 1,125.00
$ 168.75
$ 290.00
$ 666.25
The Spindrift unit was not rented at any time during 1973. In September 1974, Louise Hurley notified petitioners that she no longer would act as their rental agent. Petitioners contacted other area agents, but no arrangements were made to rent the unit. Petitioners encountered resistance to rental of their unit from other Spindrift homeowners. Jackson was extremely sensitive to the feelings of Mr. Carskaddon, his business client. He did not wish to rent the unit and incur Carskaddon's wrath. Consequently, he made only minimal attempts to rent the unit. Petitioners claimed expenses of $ 1,083 for the 1973 taxable year and $ 6,248 for 1974 in connection with the operation of their Spindrift unit. These amounts, in part, reflect their 50 percent share of the following *168 expenses incurred in connection with the Spindrift unit, less net rental income: Expenditure
1973
1974
Supplies
$ 277
$ 261
Utilities and
Assessments
63
1,071
Interest and
Loan Fees
816
4,405
Property Tax
13
797
In addition, petitioners included their share of depreciation on the condominium and its furnishings in the expenses claimed for 1973 and 1974. These amounts totaled $ 997 in 1973 and $ 6,628.92 in 1974. Petitioners filed no election under section 183(e) to postpone a determination whether an activity is engaged in for profit. The condominium unit was sold in 1978 for a profit. In the statutory notice of deficiency, respondent disallowed all deductions relating to the Spindrift unit for 1973 and 1974 other than the interest, loan fees, and property tax deductions for these years. In 1973, the undivided sum of these amounts totaled $ 829; in 1974, it totaled $ 5,202. Petitioners' share of the allowable deductions, as determined by respondent, totaled $ 415 in 1973 and $ 2,268 in 1974. As a result of additions to adjusted gross income, the statutory notice also reduced the medical deduction of $ 165 claimed by petitioners on their *169 1974 tax return, increasing their taxable income by $ 187. At trial petitioners moved to dismiss the joint venture income recognition issue. Petitioners' motion was a result of respondent's prior statement at an appearance before this court on January 29, 1980. At that proceeding respondent made the following statement: At this point in time, the [joint venture] issue has changed * * * to the extent that there is now, or there might be, an alleged positive capital account, and also, that the basis of the petitioner Jackson in the joint venture was to the extent of some $ 400,000.00. The respondent would like to make a motion to continue this case on the purpose of surprise, since we were advised of the new evidence on Thursday afternoon, and we also would like to state, for the record * * * that if the facts turn out to be as represented by the petitioner, we will concede that issue. Respondent's motion to continue the case was granted. [5]
OPINION I.Motion to Dismiss Joint Venture Issue
Petitioners raised a preliminary issue in this case as to the meaning and binding effect of prior statements made by respondent. They argue that respondent *170 stipulated that the issue concerning the transfer of the joint venture interest would be conceded if petitioners proved they had a basis in the joint venture at the time of the transfer from Jackson to HSI. Respondent, conversely, claims that his statements focused primarily on the issue of whether Jackson had a positive capital account.
The possibility of a mistake by the parties regarding these issues justified the continuance. It now appears that the original issues were not changed by the addition of any material facts. Petitioners' argument urging us not to consider these issues is without merit. Their arguments at trial and on brief convince us that they were well informed as to the issues in this case and the respondent's grounds for his determination. Furthermore, respondent's statements indicated that no concession would be made unless both basis and capital accounts were different from the amounts originally represented. Respondent's statements did not indicate a focus on "negative basis" as claimed by petitioners. Consequently, we deny the petitioners' oral motion to dismiss the joint venture issue. II. Gain on Transfer of Partnership Interest to Corporation
*171 We now turn to the substantive issue of whether the transfer of petitioner's interest in his joint venture with LEI triggered any recognized gain. In the statutory notice of deficiency respondent determined that the disposition of Jackson's 50 percent interest in the joint venture resulted in taxable gain of $ 18,111 for the year 1973 under section 1001(a). To understand how this gain was computed, it is necessary to sort through a number of different Code provisions. Section 1001(a) states in part that "[t]he gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain." The amount realized is defined in section 1001(b) as the amount of money received plus the fair market value of the property (other than money) received. [6] Section 1011(a) provides that, where applicable, the adjusted basis of the property sold is to be determined by reference to the basis provisions of subchapter K, which governs the taxation of partners and partnerships. [7]
*172 Where a sale or exchange of a partnership interest is involved, section 741 [8] specifically provides that gain or loss will be recognized to the transferor partner. Gain is recognized to the extent the amount realized exceeds the adjusted basis of the partnership interest, as determined under section 705. See section 1.741-1(a), Income Tax Regs. Section 741 also applies to any sale of a partnership interest which results in a termination of the partnership under section 708(b). [9] See section 1.741-1(b), Income Tax Regs.
*173 Section 705(a), insofar as it is relevant to this case, provides that the adjusted basis of a partner's interest in the partnership is equal to his basis under section 722, increased by the sum of his distributive share of income for the taxable year and prior taxable years, and decreased (but not below zero) by distributions described in section 733 and by the sum of his distributive share of partnership losses for the taxable year and prior taxable years. Section 722 states that the basis of a contributing partner's interest will be equal to the amount of money plus the adjusted basis of any property contributed, increased by any gain recognized to the contributing partner in connection with the transfer. Section 752(a) provides that any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liability by reason of his assumption of partnership liabilities, will be treated as a contribution of money by the partner to the partnership. Conversely, section 752(b) provides that any decrease in a partner's share of partnership liabilities, or any decrease in a partner's individual liabilities by reason of their assumption by the *174 partnership, will be treated as a distribution of money from the partnership to the partner. A partner's share of partnership liabilities is determined according to the ratio for sharing losses under the partnership agreement. Section 1.752-1(a), Income Tax Regs.Since increases or decreases in the partner's share of partnership liabilities are treated as contributions or distributions of money under section 752(a) and (b), the partner's basis in his partnership interest is also increased or decreased by corresponding amounts under section 722. Upon the sale or exchange of a partnership interest, section 752(d) provides that liabilities are to be treated in the same manner as liabilities associated with the sale or exchange of any other property. In other words, for purposes of section 1001(b) the "amount realized" on the sale or exchange of a partnership interest includes the transferor's share of partnership liabilities. Millar v. Commissioner, 577 F.2d 212 (3d Cir. 1978); Woodsam Associates, Inc. v. Commissioner, 16 T.C. 649 (1951), affd. 198 F.2d 357 (2d Cir. 1952); Tufts v. Commissioner, 70 T.C. 756 (1978) revd. *175 on another issue (5th Cir., July 27, 1981). Respondent determined Jackson's adjusted basis in his joint venture interest at the time of the alleged transfer in 1973 as follows: Contributions to capital 50 percent share of partnership liabilities: 1/2 Gibraltar loan
$ 397,500 1/2 Wells Fargo loan
24,950 Cash
Distributive share of 1972
partnership losses applied
against basis
(18,111)
Jackson's adjusted basis immediately
before the transfer
$ 404,339 Respondent further determined that a sale or exchange occurred on the transfer by virtue of the assumption of Jackson's share of joint venture liabilities by HSI in exchange for his joint venture interest. Respondent computed the amount realized on the transfer as follows: $ 422,450 Reduction in share of liabilities
(404,339)
Adjusted basis
$ 18,111 Recognized gain
Petitioner argues that no sale or exchange occurred at the transfer because there was no assumption of joint venture liabilities by HSI and, therefore, no reduction of his partner's share of liabilities and no amount realized. He reaches this conclusion by arguing (1) that the Wells Fargo loan was an obligation *176 of the joint venture before and after the transfer of his interest and, therefore, could not be assumed by HSI, and (2) that because the Gibraltar loan was guaranteed personally by Jackson, it could not be assumed by HSI. He makes a further argument that, under California law, the Gibraltar loan could not be assumed by HSI because an assumption of liability for the debt of another must be in writing to satisfy the statute of frauds. [10] Finally, Jackson argues that the transfer of his partnership interest to HSI was a nontaxable capital contribution of a partnership interest to a wholly owned corporation. In making this argument petitioner assumes that such a transfer of interest does not include a transfer of any of a joint venturer's share of joint venture liabilities. We find many of petitioner's *177 characterizations and conclusions to be incomplete. If a sale or exchange has occurred in the present case, it will be by virtue of the assumption of petitioner's share of joint venture liabilities by HSI in exchange for his entire joint venture interest. We will determine, therefore, (1) whether petitioners' joint venture interest was actually transferred, and a new joint venturer (HSI) substituted for the old one (Jackson), and (2) whether petitioner's share, as a joint venturer, of joint venture liabilities was transferred so as to trigger sale or exchange treatment at the transfer. (1) Transfer of Joint Venture Interest
Under California law, Jackson's partnership interest was his personal property, [11] and he was free to transfer either full ownership rights or lesser interests. Stilgenbaur v. United States, 115 F.2d 283, 286 (9th Cir. 1940). An interest in a partnership is defined as a partner's "share of the profits and surplus," CAL. CORP. CODE sec. 15026 (West), and conveyance of a partner's interest does not necessarily dissolve a partnership under California law. CAL. CORP. CODE sec. 15027 (West). *178 [12]
*179 In examining HSI's role in the joint venture after the transfer, certain elements of its participation may be helpful to the determination of whether HSI replaced Jackson as a joint venturer, or whether Jackson intended to convey a lesser interest than that of a full joint venturer. These elements are joint control, a community of interests in a common business undertaking, participation in the management of a joint venture, and an agreement concerning sharing of profits and losses. Connor v. Great Western Savings and Loan Ass'n., 69 Cal. 2d 850, 447 P.2d 609, 73 Cal. Reptr. 369, 39 A.L.R. 3d 224 (1968); Goldberg v. Paramount Oil Company, 143 Cal. App. 2d 215, 300 P.2d 329 (1956). See also Podell v. Commissioner, 55 T.C. 429, 431-432 (1970). Additionally, although a partner may remain a nominal partner under state law, the transfer of the interest of a partner may terminate the partnership for Federal income tax purposes. Evans v. Commissioner, 54 T.C. 40, 51 (1970), affd. 447 F.2d 547 (7th Cir. 1971); cited with approval in Morgan v. Commissioner, T.C. Memo. 1978-401, appeal dismissed *180 (9th Cir. Jan. 14, 1980). If an assignee is determined to be a partner for Federal income tax purposes, he is liable for taxation as a new partner. See 1 A. Willis, J. Pennell, P. Postlewaite, Partnership Taxation sec. 2.03, pp. 2-11-2-12 (3d ed. 1981); see also Rev. Rul. 77-137, 1977-1 C.B. 178. Petitioner recognized that after the transfer he no longer was engaged individually in the joint venture. He testified at trial to this effect and on brief he stated in a requested finding of fact that the transfer was effected in order to sever his individual relationship with the joint venture. A similar statement also is contained in the minutes of the "meeting" of HSI's board of directors at which the assignment of interest was accepted. In their stipulation of facts the parties agreed that after the assignment, HSI would assume petitioner's position in the venture and include all income of the venture in its income. Presumably, HSI would also share losses of the joint venture in the same proportion. See Nels E. Nelson Inc. v. Tarman, 163 Cal. App. 2d 714, 329 P.2d 953 (1958). Petitioner has presented no evidence showing his intent to retain any *181 incidents of ownership in the joint venture. After the assignment, managerial control over the joint venture was exercised by HSI. HSI became entitled to a share of the surplus on dissolution of the joint venture. Moreover, section 1.26 of the joint venture agreement expresses an intent that assignees of partnership interests shall assume obligations of original parties to the joint venture agreement.
In Evans v. Commissioner, 54 T.C. 40 (1970), affd. 447 F.2d 547 (7th Cir. 1971), the taxpayer transferred an undivided one-half interest in a partnership to his wholly owned corporation without the consent of his partner. We held that this was, nevertheless, a transfer of the taxpayer's entire interest and constituted a termination of the partnership with the original, individual partner for Federal tax purposes. We think it clear that the intent and actual effect of the assignment of Jackson's 50 percent joint venture interest was to give to HSI all that Jackson previously held individually. We hold, therefore, that HSI became a new partner for Federal tax purposes [13] and owned a capital interest and an interest in the profits of the joint venture, *182 both previously owned by Jackson. See Evans v. Commissioner, supra at 48. (2) Sale or Exchange Treatment
In order to be taxable under sections 1011(a) and 741, there must be a sale or exchange of a partnership interest. Respondent argues that petitioner's share of joint venture liabilities was eliminated or reduced by this transfer of joint venture interest. Sale treatment would then be in order, with the sale price equal to the share of partnership liabilities assumed. See section 752(d); Crane v. Commissioner, 331 U.S. 1 (1947); Millar v. Commissioner, 577 F.2d 212 (3d Cir. 1978), cert. denied, 439 U.S. 1046 (1978). Johnson, Jr. v. Commissioner, 59 T.C. 791, 812 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied, 419 U.S. 1040 (1974); Tufts v. Commissioner, 70 T.C. 756 (1978), revd. on another issue, (5th Cir. July 27, 1981); see also Rev. Rul. 77-402, 1977-2 C.B. 222 (realization under section 1001(b) and *183 1011(a) on transfer of share of partnership liabilities existing before partnership status changed for Federal income tax purposes). Because the joint venture losses were to be allocated equally under the joint venture agreement, each joint venturer is allocated one-half of the liabilities under section 1.752-1(e), Income Tax Regs. Because HSI succeeded Jackson as a joint venturer, it is reasonable to conclude that HSI assumed Jackson's one-half share of joint venture liabilities. Under section 752(d) the amount realized by Jackson on the transfer of the joint venture interest should then include Jackson's one-half share of partnership liabilities. See Crane v. Commissioner, supra; Millar v. Commissioner, supra; Woodsam Associates, Inc. v. Commissioner, supra.
Petitioner contends, however, that no such consideration was received from HSI in exchange for his interest in the joint venture and, therefore, that there was no sale or exchange. Petitioner's characterizations of joint venture loans led him to argue that assumption of joint venture liabilities by HSI was impossible. We will examine the two loans in the *184 present case to assess petitioner's characterizations and conclusions. Petitioner characterizes the Wells Fargo loan as an obligation of the joint venture before and after the transfer and concludes that it could not be assumed by HSI. Both petitioner and respondent argue that, as a liability incurred by petitioner and contributed to the joint venture, the one-half share ($ 24,950) of the original liability effected an increase in his basis by this amount under section 705(a), 722, and 752(a). Petitioner further contends that upon the simultaneous assumption in the joint venture agreement by the joint venture of his individual liability on the loan, his basis was decreased by $ 24,950 under sections 705(a), 722, and 752(b). Thus, petitioner characterizes the Wells Fargo loan as a joint venture obligation only, disclaims any personal liability on the note, and contends that the $ 24,950 owed should not be reflected in the calculation of his basis in the joint venture. The Wells Fargo loan was for a maximum amount of $ 70,000. The promissory note for the loan was signed on September 15, 1972 by Jackson and Del Castillo. [14] The loan was incurred to pay capital costs of the *185 joint venture not covered by other financing. Petitioner, however, presented no evidence to show that the Wells Fargo bank knew of the joint venture arrangement. The joint venture agreement was not signed by the parties until after the Wells Fargo loan was obtained. For all the Wells Fargo Bank may have known, Jackson and Del Castillo were acting in their individual capacities to finance the Castle View project. Petitioner correctly pointed out in his brief that California law prohibits a contract of special promise to answer for the debt of another without a writing, CAL. CIV. CODE sec. 1624(2) (West). [15] Thus, at all times in issue, primary liability for one-half the amount due on the Wells Fargo loan remained with Jackson. *186 As petitioner correctly points out, the joint venturers intended the joint venture to be responsible for the Wells Fargo loan payments, and expressed this intent in section 1.17 of their joint venture agreement. Although primary liability to pay the Wells Fargo loan remained with Jackson, a collateral agreement was formed between Jackson and the joint venture when the joint venture agreed to make the loans obligations of the joint venture. Such a collateral agreement is permitted under California law as between the joint venture and the joint venturers as individuals, [16] although the joint venture could not replace the parties to the primary loan. [17]W.H. Marston Co. v. Central Alaska Fisheries Co., 201 Cal. 715, 722, 258 P. 933 (1927); Merner Lumber Co. v. Brown, 218 Cal. 136, 140, 21 P.2d 590 (1933); Yule v. Bishop, 133 Cal. 574, 62 P. 68, 65 P. 1094 (1900); Berrington v. Williams, 244 Cal. App.2d 130, 52 Cal. Reptr. 772 (1966); Kilbride v. Moss, 113 Cal. 432, 45 P. 812 (1896). *187 Thus, when the proceeds of the Wells Fargo loan were contributed to the joint venture, a "due to Jackson" relationship was created on the books of the joint venture. As an equal joint venturer, Jackson's "partner's share of the liabilities of a partnership" was increased by $ 24,950, effecting an increase in the basis of his partnership interest under sections 752(a) and 722. Because California law prevents the joint venture from extinguishing personal liability of the petitioner without written notice to Wells Fargo Bank, CAL. CIV. CODE sec. 1624 (West), there was no decrease in Jackson's individual liabilities under section 752(b), and no resulting decrease in basis under sections 752(b), 722, and 705(a)(2). The $ 795,000 loan from Gibraltar Savings and Loan Association was secured by LEI and HSI. At this time, on or about October 11, 1972, HSI incurred the liability as an agent for undisclosed principal, Jackson. The Gibraltar Loan was secured by a Deed of Trust signed by Del Castillo, as president of LEI and Jackson, as president of HSI. Both corporations were parties to a Loan Settlement Statement, Import and Insurance Authorizations, and a Certification *188 Statement. In addition, at least one of the parties, Jackson, guaranteed the loan personally. As in the case of the Wells Fargo loan, there is no evidence to show that the Gibraltar Savings & Loan Association (Gibraltar) knew of the joint venture arrangement. Nor is there evidence to show that Gibraltar knew that HSI was acting merely as an agent for Jackson. The loan note shows HSI as principal on the loan. It appears from the circumstances surrounding the Gibraltar loan agreement that Jackson, in his capacity as president of HSI, bound the corporation. Under California agency law, an agent is responsible as a principal for acts in the course of his agency when credit is extended to him personally without knowledge of the agency relationship. CAL. CIV. CODE sec. 2343 (West); [18]Patterson v. John P. Mills Organization, 203 Cal. 419, 421, 264 P.759 (1928); London v. Zachary, 92 Cal. App.2d 654, 207 P.2d 1067 (1949); accord, Associated Creditors' Agency v. Davis, 13 Cal.3d 374, 530 P.2d 1084, 118 Cal. Reptr. 772 (1975). We conclude, therefore, that primary liability on the Gibraltar loan remained at all *189 times with LEI and HSI. Petitioner argues that because he personally guaranteed the Gibraltar loan, one half of the amount due on the loan, $ 397,500, should be included in calculating his basis in the partnership. This conclusion is based on an improper reading of section 752(c) in conjunction with sections 752(a) and 722 and 1.752-1(a)(2), Income Tax Regs. We agree with petitioner, however, that one-half of the Gibraltar loan should be included in the calculation of his basis, as follows. Jackson contributed his share of the Gibraltar loan to the joint venture to cover capital costs. The parties stipulated that $ 27,370 of the $ 795,000 loan was spent on October 11, 1972, and the balance spent for construction costs between October 11, 1972 and August 31, 1973. The joint venture acknowledged in *190 its joint venture agreement that the loan was on behalf of the joint venture, the stipulation of facts states that the loan was "on behalf of the joint venture," and the stipulation refers to the loan as a "joint venture debt." [19] As a result, we conclude that when Jackson contributed the proceeds of the Gibraltar loan to the capital of the joint venture, a "due to Jackson" obligation was created on the books of the joint venture. Because of this collateral agreement, Jackson's joint venturer's share of liabilities of the joint venture was increased by $ 397,500, and this amount is included in the determination of Jackson's basis in the joint venture under sections 752(a) and 722. Jackson deducted his distributive share of the operating losses of the partnership for the year 1972 in the amount of $ 18,111. Section 704. This amount was applied against his basis in the partnership, as provided in section 1.705-1(a)(3), Income Tax Regs. The adjusted basis of Jackson's interest in the joint venture was $ 404,339 at the time of the transfer of his interest to HSI, *191 determined as follows: (1) Jackson's increase in basis under
section 752(a) from: (a) Wells Fargo loan
$ 24,950 (b) Gibraltar loan
397,500 $ 422,450 (2) Jackson's decrease in basis under
section 705(a)(2)(A) from 1972
operating loss
(18,111)
(3) Adjusted basis of Jackson's
interest
$ 404,339 When HSI took Jackson's place in the joint venture it could not under state law, and did not, assume primary liability for the loans. See CAL. CIV. CODE sec. 1624. The joint venture did not have the authority to assign primary liability for such loans to the corporation. The joint venture agreement, however, indicates that the agreement shall be binding on assigns of the parties to the joint venture. After viewing all the facts and circumstances, we think it clear that the intent and effect of the transfer was to replace Jackson as a joint venturer with HSI. HSI became a party to the obligations of the joint venture. These circumstances do not contravene the policy of the California statute of frauds. Hambey v. Wood, 181 Cal. 286, 184 P.9 (1919); Le Blond v. Wolfe, 83 Cal. App.2d 282188 P.2d 278 (1948). *192 The original creditors, Wells Fargo and Gibraltar, were protected because the primary liability remained with the original parties to the two loans. There was no assignment of the personal debt Jackson or HSI owed to these creditors. Jackson, however, chose to change the form of his relation to the joint venture. He chose to cease recognizing profits and losses of the venture in his individual capacity. Instead, he had HSI report gains and losses in its corporate capacity. There are advantages and disadvantages in having a corporation, rather than an individual, act as a partner in a joint venture. Petitioner, an attorney and partner in a law firm, was able to take such considerations into account before he made the change. If the transaction is a taxable exchange, the corporation, as a new partner, had responsibility for its full share of partnership liabilities and HSI, accordingly, would be given basis of $ 422,450 against which to apply future gains and losses of the corporation. We disagree with petitioner's contention that section 362 governs non-sale or exchange treatment in the present case. First, we note that section 362 deals with basis to corporations and does *193 not apply here. Second, the situation here is quite different from the one in Abegg v. Commissioner, 50 T.C. 145 (1968), affd. 429 F.2d 1209 (2d Cir. 1970), cert. denied sub. nom Cresta Corporation, S.A. v. Commissioner, 400 U.S. 1008 (1971), on which petitioner relies. Here there is evidence of an exchange by virtue of the assumption of a share of joint venture liabilities. [20]
We therefore hold that the transfer of petitioner's joint venture interest in 1973 resulted in a taxable sale or exchange. Under section 741 the gain is treated as gain from the sale or exchange of a capital asset. [21] The gain recognized is $ *194 18,111, calculated by subtracting the adjusted basis of Jackson's interest in the joint venture, $ 404,339, from the amount realized on the transfer, $ 422,450. III. Deductibility of Condominium Rental Expenses
Next we consider the deductibility of certain expenses claimed with respect to petitioner's 50 percent ownership of the Spindrift condominium. On their Federal income tax returns for 1973 and 1974, the petitioners claimed deductions in the amounts of $ 1,083 and $ 6,248, respectively, as net losses incurred in connection with the maintenance and operation of the unit. Respondent determined that the losses claimed in connection with the condominium were not allowable because they were not incurred in a transaction entered into for profit. Respondent did, however, allow deductions for interest expenses and taxes incurred in connection with the unit for the amounts of $ 415 for 1973 and $ 2,268 for 1974. [22] The amount disallowed for the year 1974 represents petitioners' share of the excess *195 of total depreciation and other expenses over the year's net rents of $ 666.25. We must decide whether the condominium expenses claimed were incurred in connection with the production of income under sections 212 and 167(a)(2), or whether they were nondeductible personal expenses under section 262. Section 212 defines deductible expenses for the production of income as: all the ordinary and necessary expenses paid or incurred during the taxable year- (1) for the production or collection of income; (2) for the management, conservation or maintenance of property held for the *196 production of income * * * Expenses must be "paid or incurred" during the taxable year in order to be deductible. Payments for maintaining property purchased for personal reasons are nondeductible under section 212. May v. Commissioner, 35 T.C. 865 (1961); see section 262. Depreciation deductions for property are allowed under section 167(a)(2), provided the property is held for the production of income. Meredith v. Commissioner, 65 T.C. 34 (1975). Section 262 provides that no deduction is allowed for personal, living or family expenses. An example of personal expenses would be the amounts paid for maintaining a household, including expenditures for utilities and domestic service. A taxpayer who rents property for residential purposes, and only inadvertently conducts business there, is not entitled to deduct any part of the rent or expenses attributable to such property. Section 1.262-1(b)(3)-(4), Income Tax Regs.
Property rental can be a legitimate trade or business. Johnson v. Commissioner, 59 T.C. 791, 814 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied, 419 U.S. 1040 (1974); *197 Lagreide v. Commissioner, 23 T.C. 508, 512 (1954). Similarly, rental property is considered held for the production of income under the language of section 212. Sec. 1.212-1(h), Income Tax Regs.Johnson v. Commissioner, supra.In order to qualify under sections 212 or 167(a)(2), petitioners must show they had a "profit-seeking motive" in acquiring and holding the Spindrift condominium. Johnson v. Commissioner, supra at 814. In Johnson, we did not allow deductions for operating and redecorating expenses of an island cottage. The taxpayers there spent little time on the island and only occasionally rented their house, and expenses were not allowed as proper deductions. Our approach there was to consider all facts and circumstances presented. We have used this approach to allow rental expense deductions when a profit seeking motive can be established and to deny them when an intention to make a profit could not be found or substantiated. Compare Coors v. Commissioner, 60 T.C. 368 (1973), affd. 519 F.2d 1280 (10th Cir. 1975)[23] (rental expenses allowed for Aspen, Colorado condominium where *198 there was rental agreement and a substantial agency fee was paid) and Ong v. Commissioner, T.C. Memo. 1979-406 (condominium rental expenses allowed where taxpayers clearly purchased it to supplement income, made prior inquiry, and actively tried to rent the unit) with Johnson v. Commissioner, supra; Carkhuff v. Commissioner, T.C. Memo. 1969-66, affd. 425 F.2d 1400 (6th Cir. 1970) (expenses denied where it was not established that the property was offered for rental with intention of making a profit, as distinguished from helping to carry operating expenses); and Gettler v. Commissioner, T.C. Memo. 1975-87 (insufficient advertising although advertised in Wall Street Journal and information brochure was available). Jackson testified that the purchase of the condominium was, in part, motivated by the desire to please *199 his business client. This factor alone is not a persuasive indication of a primarily business related purpose. Although Jackson testified he made an investigation of rental possibilities before buying the condominium, he has neither substantiated the degree of thoroughness of the investigation, nor shown he received expert advice regarding his purchase. Because this was a new development, there was no prior rental value for Spindrift. Petitioners offered no evidence that the purchase of the condominium was precipitated by their need for rental income to supplement their income from other sources. See Ong v. Commissioner, supra.
Petitioners expended little effort to rent their apartment. Advertising was minimal or nonexistent. There was evidence of business dealings with only one broker, Louise Hurley. Hurley made clear that her efforts would be limited to a short period of time, and she ended rental agent services to petitioners soon after they started. Petitioners were free to occupy the unit for their personal use at any time. Petitioners did not receive any profit from rentals in 1973, and received only a minimal amount in 1974 because the unit *200 was rented for approximately three weeks. They admit they voluntarily refrained from trying to rent the unit. Although absence of a profit does not necessarily determine whether property is held for profit, petitioners must in good faith have expected a profit. Johnson v. Commissioner, 59 T.C. at 814. There is insufficient evidence in this record to show such an expectation. Although petitioners attempted to introduce a lease form to show rental-oriented activities, we see no reason to believe this from was ever used. Petitioners argue that their failure to produce specific evidence regarding rental expenses and purchases is due to respondent's lack of questioning. Petitioners, however, have the burden of substantiating that the expenses they claimed were actually incurred. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Finally, petitioners argue that the sale of the unit at a profit in 1978 indicates that it was held for the production of income. This fact alone does not establish a profit motive. Accord, Jasionowski v. Commissioner, 66 T.C. 312, 323 (1976). Considering all the facts and circumstances in this *201 case, we hold that petitioners did not hold their one-half interest in the Spindrift condominium for the production of income during the years 1973 and 1974. [24] Accordingly, the rental expenses in excess of those allowed by respondent are not deductible. IV. Medical Deduction
Because of additions to taxable income reflected in the statutory notice of deficiency, respondent decreased petitioners' medical deduction allowable under section 213(a) by $ 187 for the year 1974. Section 213(a)(1) allows a deduction for medical expenses incurred during the taxable year in excess of three percent of adjusted gross income. In addition, under section 213(a)(2), premiums paid for medical insurance may be deducted to the extent of the lesser of one-half of the actual expenses or $ 150. Petitioners did not contest the adjustment on brief or at trial, but in their petition they claimed respondent "erroneously *202 decreased, rather than increased petitioners' medical deduction" for 1974. We agree with respondent's computation. As adjusted gross income increases, it follows that the three percent ceiling for deductions under section 213(a)(1) increases, and that the allowable medical deduction decreases by this same amount. Accordingly, the computation of petitioners' decreased medical deduction is as follows: (1) Medical deduction claimed on 1974
income tax return (includes insurance)
$ 756 (2) Less decrease of 3% X $ 6,248
(187)
(3) Equals medical deduction allowable
[25] $ 569 Consequently, we hold that respondent's redetermination of allowable medical deduction increases petitioners' tax liability by $ 187 for the year 1974. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, unless otherwise indicated, and any reference to "Rules" shall refer to the Tax Court Rules of Practice and Procedure.↩
2. It is unclear whether petitioner was a tax specialist at the time of the events in question.↩
3. In an attachment to petitioners' 1973 tax return, the date of assignment is indicated as January 2, 1973. The parties, however, stipulated the date as January 3, 1973, and the instrument of assignment also refers to January 3.↩
4. Nor did Mr. Del Castillo object in his personal capacity. He appears to have taken no role in the venture following these events in 1973.↩
5. See Rule 134.↩
6. Section 1.1001-2(a), Income Tax Regs.↩, which became effective in 1980, and is not controlling in this case, now specifically provides that the amount realized upon the sale or other disposition of property includes the amount of liabilities from which the transferor is discharged. 7. The term "partnership" under subchapter K includes joint ventures. Section 761(a). In the discussion of the transfer at issue, references to "partnership," therefore, apply to the joint venture formed by petitioner and LEI.↩
8. Section 741 states: In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value). ↩
9. Section 708(b)(1) provides, in part: (b) TERMINATION. -- (1) GENERAL RULE.--For purposes of subsection (a), a partnership shall be considered as terminated only if-- (B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits↩. [Emphasis added.]
10. CAL. CIV. CODE sec. 1624 (West): STATUTE OF FRAUDS The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: (2) A special promise to answer for the debt, default, or miscarriage of another, except in the cases provided for in Section 2794.↩
11. California law incorporates the Uniform Partnership Act in its statutes. CAL. CORP. CODE sec. 15024 (West) states: The property rights of a partner are (1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in the management. This section is identical to UNIFORM PARTNERSHIP ACT sec. 24. ↩
12. CAL. CORP. CODE sec. 15027(1) (West) provides: (1) EFFECT OF CONVEYANCE; ASSIGNEE'S RIGHTS. A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled. [Emphasis added]. This section is identical to UNIFORM PARTNERSHIP ACT sec. 27.↩
13. Additionally, HSI appears to fulfill the requisite qualities to be termed a joint venturer under California law.↩
14. Because insufficient evidence was presented concerning Del Castillo's involvement, in tracing the subsequent history of this loan, and of the Gibraltar loan, we will consider Jackson's involvement only. ↩
15. CAL. CIV. CODE sec. 1624(2) (West) provides: The following [contract is] invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: 2. A special promise to answer for the debt, default, or miscarriage of another, except in the cases provided for in Section 2794.↩
16. California law also allows a contract arrangement to be implied where no formal one exists based on conduct and words of the parties. CAL. CIV. CODE sec. 1621 (West); Firchau v. Diamond National Corp., 345 F.2d 269, 274 (9th Cir. 1965); Youngman v. Nevada Irrigation District, 70 Cal.2d 240, 449 P.2d 462, 466↩, 74 Cal. Reptr. 398 (1969). 17. Evidence of written notification to the banks or of new consideration was not introduced in the present case. See Schumm v. Berg, 37 Cal.2d 174, 231 P.2d 39, 21 A.L.R. 2d 1051 (1951); Quadro v. Widemann, 72 Cal. App. 481, 237 P. 756↩ (1925).
18. CAL. CIV. CODE sec. 2343 (West) states, in part: AGENT'S RESPONSIBILITY TO THIRD PERSONS. One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: 1. When, with his consent, credit is given to him personally in a transaction; * * *↩
19. Furthermore, the Gibraltar loan is listed as a liability of the joint venture on its 1972 partnership return.↩
20. We recognize that lurking in the background is the question of the applicability of section 351 since Jackson received no stock or securities from HSI. See B. Bittker, J. Eustice, Federal Income Taxation of Corporations and Shareholders↩ (4th ed. 1979), pp. 3-29, n. 74, and 3-57, n. 145. But, in the context of this case, we need not face this question because, if section 351 were applicable, section 357(c) would produce the same result as does the treatment of the transaction herein as an exchange.
21. Respondent did not raise the issue of whether section 751 might operate to characterize as ordinary income any taxable amount from the sale of a partnership interest.↩
22. These amounts reflect respondent's determination of petitioners' share of interest, loan fees, and property tax on the Spindrift unit. Property taxes generally are deductible under section 164(a)(1). Section 163(a) allows a deduction for interest paid on indebtedness. No argument was raised by petitioners for qualification under section 183, which allows certain deductions notwithstanding the fact that an activity is not engaged in for profit. See section 1.183-2, Income Tax Regs.↩, defining factors to be taken into consideration in determining whether an activity is engaged in for profit.
23. In Coors we stated that "it is well settled that the absence of a profit is not determinative, but the use of the property should be of such a nature that in good faith the taxpayer genuinely expected or intended to make a profit." Coors, supra↩ at 410.
24. Even if we had found the existence of a profit motive, we do not think petitioners have substantiated expenses incurred in connection with furnishing the Spindrift unit and, therefore, no depreciation deductions would be allowable with respect to these capital outlays.↩
25. In the explanation of adjustments attached to the statutory notice, respondent transposed the figures of the allowable medical deduction, indicating an allowable deduction of $ 596. In the calculation of tax liability, however, respondent correctly increased petitioners' tax liability by $ 187.↩